# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Garcia*, 2012 IL App (1st) 103590

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BALDOMERO GARCIA, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-10-3590 |
| Filed | November 30, 2012 |
| Rehearing denied | January 16, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Based on defendant's confession and the testimony of the victim and three other witnesses, defendant's convictions for predatory criminal sexual assault were upheld, the admission of the victim's out-of-court statements was not an abuse of discretion in view of the safeguards of reliability, a prosecution expert was properly allowed to testify that the lack of physical trauma was "consistent" with sexual abuse, and the trial court's failure to conduct a hearing on defendant's fitness to stand trial did not violate defendant's right to due process. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CR-06996; the Hon. John J. Scotillo, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Sarah Curry, all of State Appellate Defender's Office, of Chicago, for appellant. |
|---|---|
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Tasha-Marie Kelly, and Koula A. Fournier, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE R. GORDON delivered the judgment of the court, with opinion. Justices Hall and Garcia concurred in the judgment and opinion. |

## OPINION

¶ 1    After a jury trial, defendant Baldomero Garcia was convicted of two counts of predatory criminal sexual assault and sentenced to two eight-year consecutive sentences in the Illinois Department of Corrections for his conduct toward L.P. (the victim), the five-year-old daughter of defendant's live-in girlfriend. On appeal, defendant argues: (1) the State did not prove him guilty beyond a reasonable doubt, (2) the trial court erred by admitting the victim's out-of-court statements into evidence, (3) the trial court erred by permitting the State's expert to testify to a medical opinion for which there was no foundation, and (4) defendant's due process rights were violated when he did not receive a fitness hearing and no independent judicial determination of defendant's fitness was made. For the reasons that follow, we affirm.

¶ 2                    BACKGROUND

¶ 3    On April 7, 2008, defendant was charged with multiple counts of predatory criminal sexual assault, criminal sexual assault, aggravated criminal sexual abuse, and criminal sexual abuse, for conduct occurring between January 1, 2008, and March 5, 2008. Defendant was charged with a total of 48 counts.

¶ 4                 I. Pretrial Proceedings

¶ 5    On October 6, 2008, the State filed a motion seeking a hearing pursuant to section 115-10 of the Code of Criminal Procedure of 1963 (the Code) (725 ILCS 5/115-10 (West 2006)) in order to admit certain statements made by the victim to several witnesses into evidence.

¶ 6    On November 18, 2008, defendant filed a motion to suppress any statements that defendant made to police, and on January 12, 2009, defendant filed an amended motion to suppress, claiming that he was not advised of his *Miranda* rights and did not knowingly, intelligently, and voluntarily waive them.

¶ 7                                              A. Fitness

¶ 8        On January 12, 2009, the parties came before Judge John Scotillo in Rolling Meadows[1] on both the State's section 115-10 motion and defendant's motion to suppress. Prior to the hearing, Assistant Public Defender (APD) Larry Kugler informed the trial court that he had attempted to speak with defendant several times about the case and had a *bona fide* doubt of defendant's fitness; consequently, defense counsel requested a fitness evaluation, which the court ordered.

¶ 9        On March 5, 2009, a letter was received by the trial court from Andrew Segovia Kulik, M.D., a forensic psychiatrist with Forensic Clinical Services, stating that Dr. Kulik attempted to evaluate defendant on February 23, 2009, but was unable to render a fitness opinion because defendant was uncooperative during the interview. Dr. Kulik believed that defendant's refusal to cooperate was volitional in nature and not due to any severe psychiatric illness.

¶ 10       On the same day, APD Kugler requested that defendant be reevaluated, since he still had a *bona fide* doubt of defendant's fitness. After speaking with defendant, APD Calvin Aguilar, APD Kugler's partner on the case, agreed, stating that he also had a *bona fide* doubt of defendant's fitness based on defendant's responses. The trial court entered another court order for an evaluation of defendant's fitness to stand trial, telling APD Kugler that "[w]e have to have a hearing if you have a bona fide doubt."

¶ 11       On April 23, 2009, the parties returned before the court concerning defendant's fitness evaluation. The trial court read a letter[2] dated April 17, 2009, in which Dr. Kulik stated that he attempted to evaluate defendant for a second time and was unable to render an opinion due to defendant's continued refusal to cooperate. The trial court suggested the matter be set for trial, but APD Kugler stated that "I'm unable to represent this defendant. I still have a bona fide doubt as to his fitness. I'm not a psychiatrist. All that I know is that I have a client who is not working with me. I'm unable to work with this client." The State stated that in light of APD Kugler's statement that he had a *bona fide* doubt of defendant's fitness, the matter needed to be set for a fitness hearing. The trial court entered an order transferring defendant's case to 26th and California for the purpose of a fitness hearing.

¶ 12       On May 12, 2009, another fitness evaluation was ordered by Judge Joseph Claps at 26th and California. On July 1, 2009, a letter was received from Roni Seltzberg, M.D., a staff forensic psychiatrist with Forensic Clinical Services, that stated that Dr. Seltzberg attempted to evaluate defendant on June 30, 2009, and that defendant responded that he " 'didn't remember' or 'didn't know' " to most of the questions posed to him concerning fitness issues. Dr. Seltzberg stated that "[t]his was in contradistinction from his apparent ability to retain explanations of courtroom terminology that he reported having no previous knowledge of, and further in contradistinction to other information that he did offer upon questioning."

---

[1]Throughout the proceedings, whenever defendant appeared in court, he was provided with a Spanish interpreter.

[2]The letter is not contained in the record on appeal.

-3-

Dr. Seltzberg opined that defendant was malingering. Dr. Seltzberg concluded that "[a]t this time, there is no evidence to suggest that Mr. Garcia is unaware of the nature of the charges or purpose of the proceedings against him, nor that he would be unable to assist counsel in his defense if he chose to do so," but stated that she would nevertheless refer him for psychological testing, which could further help to determine defendant's fitness.

¶ 13    On July 23, 2009, another letter from Dr. Seltzberg was received. The letter stated that psychological testing was scheduled for July 22, 2009, but had been canceled because an interpreter was not available. The letter requested a continuance in order to complete the evaluation, and the court granted a continuance. Several additional letters requesting continuances were subsequently received, and on September 18, 2009, a letter from Dr. Seltzberg to the trial court was received in which Dr. Seltzberg concluded within a reasonable degree of medical and psychiatric certainty that defendant was fit to stand trial based on her review of the available records, including psychological testing and clinical examinations.

¶ 14    On the same day, the parties came before the court for the fitness hearing. The court and APD Arthur Willis engaged in the following colloquy:

"APD WILLIS: Your Honor, this matter was transferred to us for fitness testing back in May of this year. We finally have a report from Dr. Seltzberg. The report states that Mr. Garcia is fit to stand trial.

THE COURT: You don't want a hearing?

APD WILLIS: Fitness is presumed, Judge. There's no hearing."

The case was transferred back to Judge Scotillo in Rolling Meadows the same day.

¶ 15    On September 24, 2009, the parties came before Judge Scotillo and discussed the proceedings before Judge Claps:

"APD DANIEL NARANJO: Before this was sent to 26th Street, I believe Mr. Garcia was–this is Larry Kugler's client. I believe he's a public defender client, Judge.

THE COURT: I don't know. I think maybe that you're right. He was sent for a fitness hearing.

APD NARANJO: Correct.

THE COURT: Do you know the outcome of that?

APD NARANJO: I don't.

ASSISTANT STATE'S ATTORNEY [(ASA)] LYNN PALAC: Your Honor, he was found fit.

THE COURT: He was found fit?

ASA PALAC: Yes.

THE COURT: Okay."

¶ 16    On October 14, 2009, the parties came before the trial court to set a date for defendant's motion to suppress and the State's section 115-10 hearing. The trial court recounted the proceedings concerning fitness:

"THE COURT: Okay. The defendant was–the defense indicated that they had a bona

fide doubt as to fitness. A hearing was held, and he was found fit."

¶ 17    On October 26, 2009, the parties again came before the court, and the ASA informed the court that, in reviewing the court file, she noticed that Forensic Clinical Services had found defendant fit to stand trial, but had not examined him for ability to understand his *Miranda* rights or sanity at the time of the offense. In discussing whether the court should enter another order, the court noted that "because the public defender indicated there was a bona fide doubt as to fitness, a fitness hearing had to be held," and APD Naranjo stated that "now that the fitness hearing has been had, Judge, and he has been found fit, I believe we're in a better position to speak to him regarding the other issues we need evaluated." The court reordered evaluations for the issues of sanity and *Miranda*.

¶ 18    On January 7, 2010, a letter from Dr. Seltzberg to the trial court was received. In the letter, Dr. Seltzberg stated that she evaluated defendant a number of times, most recently on December 2, 2009, concerning defendant's sanity at the time of the offense and his ability to understand his *Miranda* rights. Dr. Seltzberg opined, to a reasonable degree of medical and psychiatric certainty, that defendant was legally sane at the time of the offense. Due to defendant's lack of cooperation, Dr. Seltzberg had no opinion as to defendant's ability to understand his *Miranda* rights.

¶ 19    No other proceedings concerning defendant's fitness were held.

¶ 20                                    B. Section 115-10 Hearing

¶ 21    On February 11, 2010, the parties came before the trial court for a hearing on the State's section 115-10 motion to admit certain statements made by the victim into evidence. The State's first witness was Elvia G., who was "like a cousin" to Elizabeth, the victim's mother. Elvia testified through an interpreter that on March 14, 2008, she was living in an apartment in Palatine with Carlos, her husband; Elizabeth; defendant; and the victim, who was five years old at the time. Elizabeth, defendant, and the victim had been living with Elvia and Carlos for approximately two weeks. Elvia testified that she had known the victim since she was a year old and would babysit her when Elizabeth and defendant were not home.

¶ 22    Elvia testified that on the morning of March 14, 2008, she asked the victim if she wanted eggs for breakfast, and the victim began talking about defendant's "eggs." The victim told Elvia that defendant "put his eggs in her parts" and that he did so both "[i]n the front" and "from the back." When the victim discussed her "part," she touched her vaginal area and her buttocks. The victim told Elvia that she was facedown when defendant touched her and that it hurt her; the victim told Elvia that she would cry and defendant would place his hand over her mouth so that she would not scream. The victim told Elvia that defendant was clothed and forced the victim to take her clothes off.

¶ 23    The victim told Elvia that the incidents occurred on the bed in the bedroom where Elizabeth slept at the apartment they lived in prior to moving in with Elvia. The victim told Elvia that this occurred during the day "[a]ll the time while her mother was working," but could not tell Elvia the number of times it occurred because she did not know; Elvia testified that the victim did not know how to count. She also told Elvia that if she did not remove her clothes, defendant would hit her.

¶ 24    Elvia testified that after the victim told her about the incidents, Elvia called Carlos, her husband, who told her to call the victim's aunt, Maria Elena P. When Elvia called Maria, Maria came to the apartment and spoke with the victim.

¶ 25    Elvia testified that her conversation with the victim lasted between 20 and 30 minutes. She further testified that she had never heard the victim call male private parts "eggs" before, nor had she ever heard the victim use any word to describe male genitalia. She testified that she did not ask the victim any questions but that the victim simply told her everything.

¶ 26    The State's next witness was Maria Elena P., Elizabeth's sister-in-law, who also testified through an interpreter. Maria testified that she had known the victim all her life and that Elvia was her cousin's wife. Maria testified that she did not visit the victim at all when the victim lived with defendant, but that when the victim had lived with her father, Maria's brother,[3] she saw her every day, since Maria lived there as well.

¶ 27    Maria testified that on March 14, 2008, she received a phone call from Elvia and went to Elvia's home. On the phone, Elvia told Maria that "the girl was telling her things," but did not tell Maria what the victim had told Elvia. When she arrived, Maria spoke to the victim in the living room with Elvia present; Maria did not speak with Elvia prior to talking to the victim. Maria asked the victim "what was happening with her" and the victim told Maria that defendant "put his eggs on her parts." The victim pointed to her vaginal area as the area where defendant "put his eggs." The victim told Maria that defendant told her to take off her clothes and that one evening, defendant came to her room to turn off the heater and touched her. The victim indicated that defendant would touch her in the vaginal area and in the chest area. Maria did not ask the victim any other questions but was angry and called the police.

¶ 28    Maria testified that she did not ask the victim what an "egg" was, because in Mexico, where Maria was from, "we know what the eggs are. *** That's how they call the man's part, eggs." Maria testified that in Mexico, both adults and children refer to a man's penis as "eggs," but that she had never previously heard the victim use that term. Maria testified that the victim told her the incidents occurred in the bedroom of their previous home.

¶ 29    The State's next witness was Ninfi Martinez, a forensic interviewer and therapist at the Children's Advocacy Center (the CAC) of North and Northwest Cook County. Martinez testified that on March 14, 2008, she interviewed the victim at the CAC; the interview was conducted in Spanish. Martinez met the victim in the waiting room and introduced herself to Elizabeth, then walked the victim to the interview room reserved for small children, known as the "Mickey Mouse" room. The room contained a one-way mirror, behind which were several individuals observing the interview, including a detective from the Palatine police department and an assistant State's Attorney; the room did not contain any recording devices. Prior to the interview, Martinez had been given the names of the child, Elizabeth, and defendant, and knew that there had been some inappropriate contact, but had no additional information.

¶ 30    Martinez testified that the victim was five years and nine months old at the time of the

_____

[3]It is not clear when the victim lived with her father, Maria's brother, and when defendant began living with Elizabeth and the victim.

interview and appeared "somewhat scared" and timid. Martinez asked the victim her name and age, which the victim gave; when the victim said she was five years old, she held up five fingers. Martinez asked if she could count her fingers, and the victim was able to count them correctly from one to five. The victim told Martinez that she was not attending school because she had moved. Martinez asked the victim who she was living with and the victim answered that she lived with Elvia, Carlos, and Elizabeth. Martinez asked the victim where she lived before, and she said that she lived in another house with Elizabeth and nobody else. The victim stated that there were no beds in the previous home and that they slept on blankets; the victim told Martinez that Elizabeth only slept with her and nobody else. The victim testified that she had no siblings or cousins, but only friends.[4] Martinez asked if anyone was behaving badly with her, and the victim replied only that a girl at school had bitten her chest.

¶ 31    Martinez asked the victim if she knew the difference between the truth and a lie, and the victim did not answer. Martinez then explained that she gave the victim three examples and the victim was required to tell her if the example was the truth or a lie. First, Martinez said that Elizabeth was sitting in the room, and the victim stated that was the truth. Next, Martinez said that the victim's name was L.P., and the victim stated that was the truth. Finally, Martinez said that it was raining inside the interview room, and the victim stated that was the truth. They then took a break from the interview, which lasted approximately 10 minutes.

¶ 32    After the break, Martinez asked the victim if she liked to draw, and they began drawing pictures of Mickey Mouse. After they began drawing, the victim suddenly and quietly told Martinez not to tell Elizabeth, but defendant was putting his "huevos," or "eggs,"[5] "[r]ight here," pointing to her vaginal area. She further stated that when he put his "eggs" there, he moved back and forth. She told Martinez that when Elizabeth was not at home, defendant would remove the victim's clothes and his pants. Martinez asked the victim what happened after defendant removed her clothes and his pants, and the victim did not respond. Martinez asked the victim if she had actually seen defendant's "eggs," and the victim said yes; she grabbed a crayon and made a long u-shape on the paper and said that those were defendant's "eggs."

¶ 33    Martinez testified that the victim told her that the incidents occurred when Elizabeth went to work and defendant stayed home with the victim. Martinez asked the victim why she did not mention that defendant lived with her earlier, but the victim did not answer. Martinez also asked the victim why she said not to tell Elizabeth, and the victim replied that Elizabeth would be angry.

¶ 34    Martinez then gave the victim an anatomically correct drawing of a male child, explaining to the victim that "it is a special drawing and not for playing because it has all the body parts." Martinez asked the victim to mark on the drawing the parts of the body that the

---

[4]The record indicates that the victim actually had a brother who did not live with her.

[5]For the sake of consistency, we refer to the term as "eggs" and not "huevos."

victim called the "eggs." The victim took a crayon and made a mark on the drawing's penis; Martinez testified that the victim specifically made a mark on the penis and not the testicles. Martinez asked the child how many times she saw that part of defendant's body, and the victim told her "[m]any, many, many times."

¶ 35    Martinez then gave the victim an anatomically correct drawing of a female child, again explaining to the victim that it was a special drawing because it had all of its body parts. She asked the victim to mark the parts of the body that defendant had touched with his "eggs." The victim marked the drawing's vagina and buttocks. Martinez pointed to the mark that the victim had made on the drawing's vagina and asked the victim what defendant did with his "eggs" on that part of her body. The victim replied that he "put them in there" and moved her hips back and forth. The victim said that defendant did that to her "many, many, many times." Martinez then pointed to the mark that the victim had made on the drawing's buttocks and asked how defendant had touched that part of her body. The victim replied that he had touched it with his "eggs." Martinez asked the victim how she felt about it and the victim replied that she "felt bad," but was unable to explain what "bad" meant. Martinez asked the victim how many times defendant had put his "eggs" on her buttocks, and the victim replied, "many, many, many times, 1, 2, and 3" and wrote numbers on a piece of paper. The victim later said that defendant touched her buttocks "more times, many times and she said eight and nine. And then she wrote eight and nine on the piece of paper." The victim said that nobody else had ever done anything like that to her.

¶ 36    Martinez asked the victim where she was when defendant put his "eggs" in those parts of her body, and the victim stated that it was in Elizabeth's bedroom and that defendant laid her down on the floor, then lay on top of her and began moving back and forth. Martinez asked the victim if she told anyone about what defendant was doing to her, but the victim said "nobody." Martinez testified that the interview lasted approximately an hour, after which Martinez took the victim back to Elizabeth.

¶ 37    Martinez testified that the purpose of a forensic interview such as the one she conducted with the victim is not to determine whether or not a child has been sexually abused but to "conduct a fact finding interview." Martinez further testified that the questions she asked the victim were open-ended and that it was not normal for a five-year-old to have knowledge of the acts that the victim described; Martinez testified that the victim had age-appropriate use of the terminology that she used. She further testified that the victim did not have any names for her vaginal area or her buttocks.

¶ 38    Martinez testified that the term "huevos," or "eggs," is widely used in Mexico, including in movies, television, and songs. The term is not used to describe the breakfast food, but is used to describe the penis and testicles, "in the same way that [Martinez had] heard the word balls used in the U.S.A. to describe the male parts." It is an adult term, "but if the children listen to them they will use those words." Martinez testified that "it is very common" to hear other Spanish-speaking children the victim's age use the word to describe the penis.

¶ 39    After the three witnesses had testified, the trial court found their testimony as to the victim's statements about the charged offenses admissible pursuant to section 115-10 of the Code.

¶ 40                                     C. Suppression Hearing

¶ 41        On March 11, 2010, the parties came before the court for a hearing on defendant's motion to suppress any statements he made to police. The defense's first witness was Detective Carlos Gonzalez of the Palatine police department. Gonzalez testified that he interviewed defendant at approximately 10 p.m. on March 14, 2008, along with Detective Art Delgadillo, the lead detective on the case. Prior to interviewing defendant, Gonzalez read defendant his *Miranda* rights. Gonzalez interviewed defendant again just after midnight on March 15, 2008, in the presence of Delgadillo and ASA Heightross.[6] Gonzalez testified that he is fluent in both English and Spanish, and he often assisted in interpreting between Spanish and English in the course of the 10 years he had been with the Palatine police department. Gonzalez testified that he was present during the interviews of defendant to serve as a witness as well as to serve as an interpreter.[7]

¶ 42        Gonzalez testified that the 10 p.m. interview was conducted mostly by Delgadillo and was conducted entirely in Spanish. Prior to the interview, Delgadillo read defendant his *Miranda* rights in Spanish from a preprinted form. Gonzalez testified that the preprinted form had a top portion that was in English and a bottom portion in Spanish. Defendant indicated that he understood each right, after which Delgadillo asked him to sign and print his name, which he did, and Delgadillo and Gonzalez signed the form as witnesses.

¶ 43        During the midnight interview, ASA Heightross was present along with Gonzalez and Delgadillo; Heightross did not speak Spanish, so Gonzalez served as an interpreter while Heightross asked questions in English. Gonzalez testified that he read defendant his *Miranda* rights, again in Spanish. As he read defendant each right, defendant indicated that he understood, then initialed the paper next to what was being interpreted. After Gonzalez had read defendant all of his rights, defendant printed his name on the top portion of the preprinted form, and Gonzalez, Delgadillo, and Heightross signed as witnesses. After defendant's second interview, Heightross prepared a handwritten statement. The statement was placed on the table and Gonzalez translated it from English to Spanish; defendant signed each page after it was translated.

¶ 44        The defense's second witness was defendant, who testified through an interpreter. Defendant testified that he was born in Guatemala and did not speak or understand English. Defendant testified that on March 14, 2008, he was interviewed at the Palatine police department. He testified that he was informed that he had the right to remain silent and that anything that he said could be used against him in a court of law, but was not informed that he had the right to consult an attorney, to have an attorney present during the interrogation, or to have an attorney provided if he could not afford one. Defendant testified that before being questioned by the police officers, he told them that he wished to call his friends so that they could look for an attorney to represent him, and the police officers agreed, but later told

---

[6]The record, and the parties, refer to the ASA as "Heightross" and "Heighross." For the sake of consistency, we use the spelling "Heightross."

[7]Gonzalez testified that Detective Delgadillo also spoke Spanish fluently.

him that there was no time for that. Defendant testified that he did not sign any documents concerning his *Miranda* rights and testified that he was interviewed in English by a woman; he did not recall being interviewed in Spanish. Defendant testified that he could not read or write and was unable to sign even his name.

¶ 45    The trial court denied defendant's motion to suppress.

¶ 46                                    II. Trial

¶ 47    Defendant's first trial began on April 26, 2010, and ended on April 29, 2010, when the trial court declared a mistrial because of a hung jury.

¶ 48    Defendant's retrial began on August 9, 2010. The State proceeded on two counts of predatory criminal sexual assault, one for contact between defendant's penis and the victim's vagina and the other for contact between defendant's penis and the victim's anus; the remaining counts were nol-prossed.

¶ 49    The State's first witness was the victim, who was eight years old at the time of trial. The victim testified that she spoke both Spanish and English, and mostly spoke Spanish when she was at home. The victim testified that she was currently living with her aunt, but before that, she lived with Elizabeth and Elvia. The ASA asked the victim several questions to test whether the victim knew the difference between the truth and a lie, and the victim answered appropriately. The victim then identified several body parts, such as the nose and mouth, then was shown a picture of an unclothed female child. The victim identified the part of the body used to go to the bathroom as the "[p]rivate part" and identified another part used to go to the bathroom as the "[b]utt," which was located "[o]n the back." The victim testified that both the front private part and the butt "have an inside and an outside part."

¶ 50    The victim was then shown a picture of an unclothed male child. The victim identified the part of the body that a boy uses to go to the bathroom as the "[p]rivate part," but explained that it was different than a girl's private part, and testified that a boy also has a "butt."

¶ 51    The victim testified that when she was five years old, she lived with Elizabeth and Elvia, her aunt. She also lived with Carlos, Elvia's boyfriend, and defendant, Elizabeth's boyfriend. Prior to living with Elvia, she lived in a different apartment with Elizabeth and defendant. When Elizabeth went to work, defendant would stay home and babysit the victim; defendant did not have a job. The victim testified that defendant abused her by hitting her and "touching [her] private parts" with his "private part." In response to questions asking where defendant touched her, the victim marked the picture of the unclothed female child on the places she had identified as the "private part" and the "butt." The victim testified that when defendant touched her private part with his private part, it went inside her private part, which she knew because she "felt it"; the victim testified that "[i]t hurts a lot." She further testified that when defendant touched her butt with his private part, it went inside her butt, which she knew because she "felt it"; the victim again testified that "[i]t hurts."

¶ 52    The victim testified that she told defendant to stop but he did not. She further testified that both she and defendant were unclothed when defendant touched her; defendant took her clothes off, as well as his own. When defendant touched her private part with his private part,

the victim was "laying down" on a bed "on [her] tummy." She could not recall the number of times that defendant had touched her, but testified that it was more than three times; each time, it was in the apartment and the victim was lying on her "tummy" or on her back.

¶ 53    The victim testified that once they moved in with Elvia, she told Elvia about what defendant had done. After she told Elvia, she told her Aunt Maria and another aunt; she told them what had occurred in Spanish. The victim testified that she did not say anything earlier because she was "scared" of defendant. After she told her aunts what had occurred, she was taken to a place to talk to another woman about what had happened. She talked to the woman in Spanish and told her what defendant had done to her.

¶ 54    The victim testified that approximately a year later, she spoke to the same woman again about Elizabeth. She told the woman that Elizabeth had touched her private part with her finger, and showed her on a picture what she meant by "private part." Several years after that, the victim came to a courtroom and was asked about Elizabeth touching her. On that day, Elizabeth was in the courtroom, and it had been a long time since the victim had seen her. When she was asked whether Elizabeth had touched her, the victim had testified that she had not; the victim testified that she had missed Elizabeth then. The victim testified that she had not seen Elizabeth since then and that she still missed her and wanted to see her again.

¶ 55    On cross-examination, the victim testified that she could not recall how long they lived in the apartment, but knew it was through the spring and summer, but not the winter. The victim testified that she and Elizabeth had separate bedrooms. The victim testified that she could not recall the time of day when defendant first touched her, but knew that it was during the spring and not during a school day, so she was home all day. The victim testified that she was in her room and Elizabeth's room when defendant touched her. She was sleeping on a bed when defendant first approached her; the victim testified that she never told the woman that she spoke to that she did not have a bed in her room. The victim testified that she was sleeping in her school clothes, which defendant removed. She woke up when she heard the door open, but defendant did not say anything; the victim testified that she was afraid of defendant. When he came into the room, he turned off a fan, and then climbed "on top of" the victim, which hurt her. He grabbed the victim and carried her to Elizabeth's room, where he placed her on the bed. He took the victim's clothes off and touched her. The victim testified that he hit her in her private part with his private part and that it lasted "[a] long time." The victim testified that she had never seen a man's private part before that first time and that nothing came out of his private part. When he was finished, he carried the victim back to her room, and he went back to Elizabeth's room. The victim did not tell Elizabeth when she came home.

¶ 56    The victim testified that she had marks on her back because defendant hit her with a "cleaner," which was a hard object. She did not tell the woman she spoke to about the marks.

¶ 57    The victim testified that the second time that defendant did something bad to her was the next day. She was sleeping in her room because it was a Saturday; the victim was wearing her pajamas. Defendant came into her room and woke her by turning on the fan. He carried her into Elizabeth's room, where he touched her. The victim testified that this time, he spoke to her. He took both of their clothes off, but did not hit her; the victim testified that the

bruises were gone from the first time.

¶ 58     The victim testified that defendant touched her private parts with his private parts "[a] lot of times," approximately 20 times; more specifically, she testified that he put his penis in her front private part 20 times and in her back private part 20 times. The victim never told Elizabeth what defendant was doing to her, and other than the first time, she never had any marks or bruises.

¶ 59     The victim testified that she also talked to the same woman many months later about Elizabeth and told the woman that Elizabeth put her finger in the victim's front private part, demonstrating it on a doll. Later, when she came to a courtroom, she stated that it was not true. The victim testified that she told the woman that Elizabeth had done so "[b]ecause Elvia told me" to tell her that. The victim testified that when she came to court and saw her mother, she wanted to be back with her mother. She testified that defendant was not her father and that prior to living with defendant, she lived with Elizabeth and her father; the victim testified that she did not want to live with defendant.

¶ 60     The State's next witnesses were Maria Elena P. and Elvia G., both of whom testified through an interpreter. Both Maria and Elvia testified similarly to their testimony during the hearing on the State's section 115-10 motion. Additionally, Elvia testified that in Mexico, the term "huevos" was also used to mean a man's penis.

¶ 61     The State's next witness was Dr. Afsoon Karimi, who was employed by Loyola University as an assistant professor and director of its child abuse division; Dr. Karimi testified that she was a board-certified pediatrician with a subspecialty in the area of child abuse and neglect. Dr. Karimi testified that she evaluated the victim on March 18, 2008, at the Hoffman Estates CAC. Dr. Karimi had been informed by the advocate that worked at the CAC that the victim had a victim-sensitive interview in which she had disclosed genital-genital and genital-anal contact or penetration, and that the perpetrator was an adult male. Dr. Karimi received a medical history from Elizabeth prior to the examination, then performed a head-to-toe examination of the victim, which was normal.

¶ 62     Dr. Karimi then performed a genital examination of the victim; she testified that in her experience of examining over 3,000 patients, over 95% of the time, the genital examination is normal. She testified that in the victim's case, the victim had a normal genital examination. Dr. Karimi explained that penetration was still consistent with a normal genital evaluation:

        "It's very normal to have a normal exam in cases of allegations of child sexual abuse. Even though there are genital-to-genital contact, genital-to-genital penetration, genital-anal contact, genital-anal penetration, we can still have normal examination. It's not surprising. More than 95 percent of the time, a normal exam."

Dr. Karimi testified that this could still be the case where an adult male had inserted his penis into a five-year-old girl's vagina because of the flexibility and elasticity of the vagina and hymen, as well as its capability of healing quickly without leaving scars; Dr. Karimi further testified that "penetration" could include rubbing the penis between the labia and not necessarily intravaginal penetration.

¶ 63     Dr. Karimi testified that it was not unusual for there to be no tear in the victim's vaginal or hymen area. Dr. Karimi then testified:

-12-

"Q. So is it your testimony that trauma to the vaginal area can occur with injury? It's possible to have injury?

A. Correct.

Q. But is it also your testimony that trauma can occur to the vaginal area and present no injury whatsoever?

A. Correct.

Q. It doesn't matter whether there are signs of injuries or not. That would still be consistent with the allegation of genital-to-genital contact with penetration in this case; is that right?

A. Yes, correct."

¶ 64    Dr. Karimi testified that after examining the victim's vaginal area, she examined the victim's anal area, and the anal exam was also normal. She testified that a normal anal exam was even more common than a normal vaginal exam due to its flexibility and fast healing, and that out of her 3,000 patients, only one had an anal finding. She further testified:

"Q. If there were anal penetration as late as February 2008, how is that–the fact that there was penetration, how is that consistent with you not finding any injury to the anal area on March 18th?

A. That's not unusual to have no findings, especially anal findings, during that examination in March of 2008.

Q. So is it your testimony that trauma to the anal area can occur with signs of injury?

A. Yes.

Q. And is it also your testimony that trauma can occur to the anal area without any sign of injury whatsoever?

A. Correct.

Q. It doesn't matter whether there were signs of injuries in this case. It still would be consistent with [the victim] having genital-to-anal contact with possible penetration?

A. Correct."

¶ 65    Dr. Karimi testified that no sexual assault kit was completed in the instant case, because "[t]here wasn't any point of doing it," given the amount of time that had passed since the last contact between the victim and defendant. Dr. Karimi opined, within a reasonable degree of medical certainty, that the victim's "constellation of medical findings was consistent with child sexual abuse, genital-genital contact, genital-anal contact, genital-genital penetration, genital-anal penetration." Dr. Karimi further testified that her opinion was "[b]ased on [her] experience, [her] education, based on literature, other people who had the same experience."

¶ 66    On cross-examination, Dr. Karimi repeated that all of the victim's tests were "absolutely normal." Dr. Karimi further testified:

"Q. *** [T]hese findings are completely consistent with a child who has never been sexually abused; isn't that correct?

A. A normal exam doesn't mean that a child is abused or not abused. I don't know. I wasn't there.

-13-

Q. I understand, but if it's a normal exam, that's completely consistent with a child who was never sexually abused; isn't that correct, a normal exam?

A. A normal exam is consistent with–really, if there is any history of child sexual abuse, it might or might not be. I don't know.

\*\*\*

But in this case there was a history of child sexual abuse. Well, now when we have the history and normal exam, I'm not surprised because most of the time the kids who have the history of sexual abuse have the normal examination.

And I'm not the one who determines that the kids have been sexually abused or not because there are investigators, there are DCFS workers. I mean–

\*\*\*

–my job as a physician–I'm sorry. My job as a physician is just to look at the child medically to see if they are healthy or not, and she was healthy.

Q. Exactly.

And that would be consistent with a child who was not sexually abused?

A. A child who is not sexually abused can have [a] normal examination or not have a normal examination for whatever reason.

Q. [The victim], her examination was consistent with a child who had not been sexually abused; isn't that true?

\* \* \*

A. [The victim's] examination was normal, including general exam and genital-anal exam. And a kid who hasn't been sexually abused can have a normal examination, yes, and any kid who has been sexually abused can have a normal exam, too.

So she's which one of them? I don't know.

But it's another part of the investigation that has nothing to do with my job."

¶ 67     The State's next witness was Ninfa Martinez, who testified consistently with her testimony at the hearing on the State's section 115-10 motion. Additionally, she testified that she was a licensed clinical professional counselor and a licensed marriage and family therapist and had performed approximately 1,000 forensic interviews with children from 3 to 18 years old, 95% of which had been conducted in Spanish. She further testified that her interview with the victim was not recorded in any way because, while the CAC now had the capability to record, in 2008, it did not.

¶ 68     The State's final witness was Detective Carlos Gonzalez, who testified consistently with his testimony at the suppression hearing. Additionally, he testified that on March 14, 2008, he received a dispatch call sometime after 3 p.m. to go to an address in Palatine because Cook County sheriff's police were there with an individual who had alleged that she was sexually abused; Gonzalez was the first officer from Palatine to respond. Gonzalez testified that he met the victim, who was accompanied by Elizabeth, Maria, and Elvia; defendant was also present. Based on the information that he had received, Gonzalez asked them if they would accompany him to the police department for further investigation. The victim,

Elizabeth, Maria, and Elvia drove separately, but defendant told Gonzalez that he had no way to go to the police station since he did not have a driver's license. Gonzalez testified that two detectives offered him a ride to the police station; defendant was not handcuffed at that time. At the police station, defendant sat in a conference room while the others sat either in the lobby or in a smaller conference room; defendant was not handcuffed or otherwise restrained.

¶ 69 Gonzalez testified that he spoke with each adult individually and away from the others; he did not speak with the victim but instead sent her for a forensic interview with the Hoffman Estates CAC, which was standard procedure for a child that age. After the interview had concluded, Gonzalez returned to the police station, where he and Detective Delgadillo spoke with defendant.

¶ 70 Gonzalez testified that after reading defendant his *Miranda* rights, he and Delgadillo began questioning defendant; defendant's demeanor was "calm and cooperative and very forthcoming. He was honest. He was remorseful." Once they confronted defendant with the allegations that the victim had made, defendant admitted what he had done. The detectives contacted ASA Heightross.

¶ 71 After defendant was again read his *Miranda* rights, ASA Heightross spoke with defendant, with Gonzalez translating; Gonzalez testified that he translated word-for-word what was said. After speaking with defendant, ASA Heightross prepared a six-page written statement, which Gonzalez translated. After the statement was prepared, Gonzalez translated what was written into Spanish for defendant. Gonzalez testified that statements are written in English because when they are presented in court "it needs to be legible and the people need to be able to read it."

¶ 72 Defendant's statement was then offered and received into evidence and then published to the jury. In the statement, defendant stated that in January 2008, he began having sexual relations with the victim while Elizabeth was at work. This happened a total of four times, twice in January 2008 and twice in February 2008. All four times, it occurred in a small room where the victim slept on the floor. Defendant pulled down the victim's underwear and placed his penis in her vagina or buttocks from behind while the victim was laying on her stomach. The victim told him to stop but he did not. He ejaculated on the victim's buttocks and cleaned her off with a towel. The last time, defendant did not remove his or the victim's underwear and rubbed his penis on the victim's vagina and buttocks until he ejaculated in his underwear. The first two times, defendant told the victim not to tell her mother. Defendant also admitted to placing his penis into the victim's vagina for sexual gratification.

¶ 73 The State rested and defendant made a motion for a directed finding, which the trial court denied. The defense did not present any evidence and defendant did not testify.

¶ 74 The jury found defendant guilty of both counts of predatory criminal sexual assault.

¶ 75 On September 8, 2010, defendant filed a posttrial motion for a new trial, and filed an amended posttrial motion on September 16, 2010, which the trial court denied.

¶ 76 On October 12, 2010, after presenting evidence in mitigation,[8] defendant was sentenced

---

[8]The State stated that it did not wish to present any evidence in aggravation.

to eight years in the Illinois Department of Corrections on each of two counts of predatory criminal sexual assault, to be served consecutively.

¶ 77    On November 1, 2010, defendant filed a motion to vacate or reduce his sentence, which the trial court denied. Defendant timely filed a notice of appeal.

¶ 78                                      ANALYSIS

¶ 79    On appeal, defendant argues: (1) the State did not prove him guilty beyond a reasonable doubt, (2) the trial court erred by admitting the victim's out-of-court statements into evidence, (3) the trial court erred by permitting the State's expert to testify to a medical opinion for which there was no foundation, and (4) defendant's due process rights were violated when he did not receive a fitness hearing and no independent judicial determination of defendant's fitness was made. We consider each argument in turn.

¶ 80                                 I. Reasonable Doubt

¶ 81    Defendant first argues that the State did not prove him guilty of predatory criminal sexual assault beyond a reasonable doubt because (1) the victim's testimony was incredible, (2) the victim's statements to Elvia, Maria, and Martinez were incredible, (3) there was no physical evidence presented, and (4) defendant's statement to the police was not reliable. In order to be convicted of predatory criminal sexual assault of a child, the accused must be 17 years of age or over, the victim must be under 13 years of age, and the accused must commit "an act of sexual penetration" with the victim. 720 ILCS 5/12-14.1(a)(1) (West 2006). "Sexual penetration" is further defined as "any contact, however slight, between the sex organ or anus of one person by an object, the sex organ, mouth or anus of another person." 720 ILCS 5/12-12(f) (West 2006).

¶ 82    When reviewing the sufficiency of the evidence in a criminal case, we must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Smith*, 185 Ill. 2d 532, 541 (1999). "[A] reviewing court will not reverse a criminal conviction unless the evidence is so unreasonable, improbable or unsatisfactory as to create a reasonable doubt of the defendant's guilt." *People v. Rowell*, 229 Ill. 2d 82, 98 (2008). A reviewing court does not retry the defendant or substitute its judgment for that of the trier of fact with regard to the credibility of witnesses or the weight to be given to each witness's testimony. *People v. Jackson*, 232 Ill. 2d 246, 281 (2009); *People v. Ross*, 229 Ill. 2d 255, 272 (2008). Instead, "it is our duty to carefully examine the evidence while bearing in mind that the trier of fact is in the best position to judge the credibility of witnesses, and due consideration must be given to the fact that the fact finder saw and heard the witnesses." *People v. Herman*, 407 Ill. App. 3d 688, 704 (2011) (citing *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004), and *People v. Smith*, 185 Ill. 2d 532, 541 (1999)).

¶ 83    Defendant first focuses on the victim's statements, both in court and to Elvia, Maria, and Martinez, arguing that her testimony was impeached through "inconsistencies, contradictions, [the victim's] inability to differentiate between the truth and a lie, and the

-16-

similar false allegations [the victim] made against her mother." Defendant claims that the fact that the victim made similar false accusations against Elizabeth "significantly undermines her credibility," as does the fact that there are inconsistencies in what the victim told Elvia, Maria, and Martinez. We do not find defendant's argument persuasive.

¶ 84    "[A] complainant's testimony need not be unimpeached, uncontradicted, crystal clear, or perfect in order to sustain a conviction for sexual abuse. [Citations.] Where minor inconsistencies or discrepancies exist in a complainant's testimony but do not detract from the reasonableness of her story as a whole, the complainant's testimony may be found to be adequate to support a conviction for sexual abuse. [Citations.]" *People v. Soler*, 228 Ill. App. 3d 183, 200 (1992). In the case at bar, we cannot find that the inconsistencies in the victim's testimony and prior outcry to Elvia, Maria, and Martinez are so egregious as to detract from the reasonableness of her story as a whole. The victim consistently stated that defendant "put his eggs in her parts," meaning her vagina and buttocks, and that he did so at their previous apartment while Elizabeth was at work. The victim was also able to identify a male's "eggs" in a drawing and drew a picture of defendant's "eggs." By contrast, the discrepancies pointed to by defendant involve such minor matters as whether the incidents occurred on a bed or on a blanket, or whether they occurred in the victim's room or in Elizabeth's. Defendant argues that if the victim was coached or her testimony was otherwise suggested, it "make[s] sense" that the victim would be consistent in the major allegations but inconsistent in the smaller details, "because she would have had to invent that information on her own." However, it is not our function as a reviewing court to engage in this sort of speculation. Instead, we examine the evidence in the record to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *Jackson*, 443 U.S. at 319; *Smith*, 185 Ill. 2d at 541. Here, we cannot find that any inconsistencies in the victim's account are so serious as to prevent a rational trier of fact from finding defendant guilty beyond a reasonable doubt.

¶ 85    Additionally, "discrepancies in testimony *** do not necessarily destroy the credibility of a witness, but go only to the weight to be afforded his testimony." *People v. Ranola*, 153 Ill. App. 3d 92, 98 (1987); *People v. Tirado*, 254 Ill. App. 3d 497, 513 (1993). In the case at bar, all of the testimony, from the victim and from Elvia, Maria, and Martinez, was before the jury, and the jury was able to hear any inconsistencies in the victim's account and determine the proper weight to be afforded that testimony. The jury was also able to hear that the victim incorrectly answered Martinez's questions about the difference between the truth and a lie, and observe her answer similar questions when testifying. Given the fact that the jury was in the best position to observe the witnesses and judge their credibility, we cannot find that its decision to believe the victim's account was in error.

¶ 86    Defendant also argues that "child testimony should be viewed suspiciously because children are more vulnerable to suggestion and are unable to separate recollected suggestion from reality." However, defendant fails to recognize that several of the cases he cites, while supporting that claim, also note that one way to help alleviate concerns about a statement's reliability is to ensure a face-to-face confrontation between the child and the accused. See, *e.g.*, *Coy v. Iowa*, 487 U.S. 1012, 1020 (1988) (noting that a face-to-face confrontation between the accused and the accuser may serve to "confound and undo the false accuser, or

reveal the child coached by a malevolent adult"); *Maryland v. Craig*, 497 U.S. 836, 869 (1990) (Scalia, J., dissenting, joined by Brennan, Marshall, and Stevens, JJ.) (pointing to "[t]he value of the confrontation right in guarding against a child's distorted or coerced recollections" in preventing convictions of innocent people based on a child's erroneous testimony). Here, there was such a face-to-face confrontation: the victim was present and testified in court.

¶ 87     Finally, while it is troubling that the victim falsely accused Elizabeth of assaulting her and testified that she did so "[b]ecause Elvia told [her]" to, we cannot say this fact alone renders the victim's testimony and prior outcry incredible. The accusation against Elizabeth was made a year after the allegations in the case at bar. We also must bear in mind that the Illinois Supreme Court has "specifically rejected the use of evidence of specific past instances of untruthfulness to impeach a witness' truthfulness." *People v. Cookson*, 215 Ill. 2d 194, 216 (2005). Here, we are dealing with a later instance of untruthfulness and the jury was apprised of the false accusation and still found sufficient evidence to find defendant guilty. Accordingly, for the false accusation against Elizabeth to be used to attack the victim's credibility, it would need to be used as evidence that the victim possessed an improper interest, bias, or motive to lie. See *Cookson*, 215 Ill. 2d at 216. Here, defendant argues that the false accusation against Elizabeth demonstrates the victim's motive to lie: "[b]ecause Elvia told [her]" to. Defendant argues if Elvia told the victim to lie about Elizabeth, "it is certainly possible" that Elvia also told the victim to lie about defendant, and that this information undermines both the victim's and Elvia's testimony. We do not find this argument persuasive, since, as we have noted, the jury was able to hear both that the victim falsely accused Elizabeth and that she did so because Elvia told her to. Moreover, our review does not focus on what is "possible," but on whether, taking the evidence in the record in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *Jackson*, 443 U.S. at 319; *Smith*, 185 Ill. 2d at 541.

¶ 88     In the case at bar, each claim that defendant makes to the victim's statements was before the jury and the jury was able to consider it in deciding what weight to give to the victim's testimony. For instance, the jury heard that the victim had accused Elizabeth of touching her, then recanted that testimony at Elizabeth's trial. The jury also heard the victim, Elvia, Maria, and Martinez testify as to defendant's conduct and was able to hear any contradictions in the victim's account, and also heard Martinez's testimony about the victim's difficulty telling the difference between the truth and a lie. Essentially, defendant argues that the victim's statements should not have been given any weight by the jury because the victim was impeached. However, as noted, we may not substitute our judgment for that of the trier of fact with regard to the credibility of witnesses and will not do so here. See *Jackson*, 232 Ill. 2d at 281; *Ross*, 229 Ill. 2d at 272.

¶ 89     Defendant next points to the fact that there was no physical evidence to demonstrate that he was proven guilty beyond a reasonable doubt. Defendant is correct in stating that there was no medical evidence showing trauma to the victim's genitals. However, courts have held that evidence of trauma is unnecessary because the statute considers penetration to have occurred as a result of "*any contact, however slight*, between the sex organ or anus of one

person by an object, the sex organ, mouth or anus of another person." (Emphasis added.) 720 ILCS 5/12-12(f) (West 2006); see, *e.g.*, *People v. Hillier*, 392 Ill. App. 3d 66, 69 (2009) ("A jury may reasonably infer than an act of penetration occurred based on testimony that the defendant 'rubbed,' 'felt' or 'handled' the victim's vagina." (quoting *People v. Bell*, 234 Ill. App. 3d 631, 636 (1992))); *People v. Fryer*, 247 Ill. App. 3d 1051, 1058 (1993) (finding the defendant's argument that there was insufficient evidence to show penetration because there was no medical evidence "untenable," since "[i]t has been expressly rejected"); *People v. Diaz*, 201 Ill. App. 3d 830, 834 (1990) ("Although medical testimony is of value in cases of sexual abuse, even where there is no such testimony, the testimony of the victim alone will support a conviction unless that testimony is unbelievable as a matter of law."); *People v. Morgan*, 149 Ill. App. 3d 733, 738 (1986) ("It is not necessary that corroborating medical evidence be admitted to prove that penetration did occur."). For instance, the defendant in *People v. Moore*, 199 Ill. App. 3d 747, 773 (1990), argued that without evidence of trauma and with the victim's hymen still intact there could not have been penetration. We rejected that argument, holding that "it is clear that the statutory definition does not require physical penetration but merely requires contact." *Moore*, 199 Ill. App. 3d at 773. Likewise, here, the jury could properly have found defendant guilty beyond a reasonable doubt despite the lack of physical evidence. In addition, the medical testimony of Dr. Karimi demonstrated that trauma or penetration can occur and "present no injury whatsoever."

¶ 90　　Finally, defendant argues that his statement to the police was unreliable and therefore insufficient to support a finding of guilt. Defendant points to the fact that the statement he signed was written in English, but he neither speaks nor reads English. We do not find defendant's argument persuasive. The record clearly demonstrates that defendant was read his *Miranda* rights, twice, in Spanish, was interviewed in Spanish, and had a word-for-word Spanish translation of his statement read to him by Detective Gonzalez. Thus, defendant's argument that his "signed written statement was written in a language that [defendant] could not read, write or speak" is not an accurate statement of the record and does not provide a basis for finding the statement so unreliable that no rational jury could have found defendant guilty beyond a reasonable doubt. Defendant attempts to cast doubt on the accuracy of Gonzalez's translation, "given the extent to which [D]etective Gonzalez was involved in the investigation," but there is absolutely no evidence in the record that Gonzalez behaved improperly and we will not speculate that he did. Furthermore, as in the case of the reliability of the victim's statements, the jury was able to hear testimony concerning the circumstances under which defendant signed his written statement and was able to weigh the testimony and the content of the statement accordingly.

¶ 91　　In light of the victim's testimony; the testimony of Elvia, Maria, and Martinez; and defendant's statement admitting to the crime, we find that a rational jury certainly could have found defendant guilty beyond a reasonable doubt and, accordingly, affirm the trial court.

¶ 92　　　　　　　　　　　　II. Section 115-10 Statements

¶ 93　　Defendant's second argument on appeal is that he is entitled to a new trial because the trial court erred in admitting the victim's out-of-court statements to Elvia, Maria, and

Martinez pursuant to section 115-10 of the Code because the State failed to prove the reliability of the statements.

¶ 94    Section 115-10 provides:

"(a) In a prosecution for a physical or sexual act perpetrated upon or against a child under the age of 13, *** the following evidence shall be admitted as an exception to the hearsay rule:

(1) testimony by the victim of an out of court statement made by the victim that he or she complained of such act to another; and

(2) testimony of an out of court statement made by the victim describing any complaint of such act or matter or detail pertaining to any act which is an element of an offense which is the subject of a prosecution for a sexual act or physical act against that victim." 725 ILCS 5/115-10(a) (West 2006).

However, section 115-10 further provides:

"(b) Such testimony shall only be admitted if:

(1) The court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability; and

(2) The child *** either:

(A) testifies at the proceeding; or

(B) is unavailable as a witness and there is corroborative evidence of the act which is the subject of the statement; and

(3) In a case involving an offense perpetrated against a child under the age of 13, the out of court statement was made before the victim attained 13 years of age or within 3 months after the commission of the offense, whichever occurs later, but the statement may be admitted regardless of the age of the victim at the time of the proceeding." 725 ILCS 5/115-10(b) (West 2006).

In the case at bar, defendant argues that the victim's outcry to Elvia, Maria, and Martinez was not sufficiently reliable based on the time, content, and circumstances of the outcry, and therefore, the trial court erred in admitting the testimony of the outcry witnesses.

¶ 95    "When conducting a section 115-10 hearing, a trial court must evaluate the totality of the circumstances surrounding the making of the hearsay statements." *People v. Simpkins*, 297 Ill. App. 3d 668, 676 (1998); *People v. Sharp*, 391 Ill. App. 3d 947, 955 (2009). "In determining the reliability of the child's hearsay statement, relevant factors include, but are not limited to, (1) the spontaneity and consistent repetition of the statement; (2) the mental state of the child in giving the statement; (3) the use of terminology not expected in a child of comparable age; and (4) the lack of a motive to fabricate." *People v. Bowen*, 183 Ill. 2d 103, 120 (1998) (citing *People v. West*, 158 Ill. 2d 155, 164 (1994)).

¶ 96    "The State, as the proponent of the challenged statements, [bears] the burden of establishing that the statements were reliable and not the result of adult prompting or manipulation." *People v. Zwart*, 151 Ill. 2d 37, 45 (1992). The admission of evidence pursuant to section 115-10 of the Code is reviewed for an abuse of discretion. *Bowen*, 183

Ill. 2d at 120; *Zwart*, 151 Ill. 2d at 44. " 'An abuse of discretion occurs when the [court's] ruling is arbitrary, fanciful, or unreasonable, or when no reasonable person would take the same view.' " *Sharp*, 391 Ill. App. 3d at 955 (quoting *People v. Robertson*, 312 Ill. App. 3d 467, 469 (2000)).

¶ 97    In the case at bar, the trial court found the statements made to Elvia, Maria, and Martinez to contain sufficient safeguards of reliability. The court noted that the victim's repeated statements were consistent, that there was no motive to falsify, and that she spoke in age-appropriate terms; the court further noted that the victim's difficulty in answering Martinez's questions about the difference between the truth and a lie "goes to the weight of the testimony." The jury also heard all of this testimony during trial and made its own credibility determinations. We cannot find that the trial court's decision was an abuse of discretion.

¶ 98    First, the victim's statement to each outcry witness was substantially consistent with the statements she made to the other outcry witnesses. See *Sharp*, 391 Ill. App. 3d at 956 (noting that statements were "substantially consistent" as a factor in favor of the statement's reliability). As in his argument concerning the sufficiency of the evidence, defendant here argues that there were several significant contradictions in the statements. However, as noted, the discrepancies pointed to by defendant involve such minor matters as whether the incidents occurred on a bed or on a blanket, or whether they occurred in the victim's room or in Elizabeth's. There is no dispute that the victim consistently stated that defendant "put his eggs in her parts," meaning her vagina and buttocks, and that he did so at their previous apartment while Elizabeth was at work.

¶ 99    The statements were also spontaneous and not the result of leading questions. Elvia testified that she was asking the victim about breakfast when the victim began speaking about defendant's "eggs," and that Elvia did not ask the victim any questions. Likewise, Maria testified that the only question she asked the victim was "what was happening with her" and that she did not even know about the content of the victim's statement to Elvia prior to speaking with the victim. Finally, Martinez testified that the only information she knew prior to her interview with the victim was the names of the victim, Elizabeth, and defendant and that there had been some inappropriate conduct. Martinez also testified that the purpose of a forensic interview such as the one she conducted with the victim is not to determine whether or not a child has been sexually abused but to "conduct a fact finding interview." Martinez further testified that the questions she asked the victim were open-ended and that the victim spontaneously brought up the subject of defendant's conduct while they were drawing.

¶ 100    Defendant points to the fact that the victim could not tell the difference between the truth and a lie before Martinez, and told her several untrue statements, as weighing against the reliability of the statements. Likewise, defendant notes that Martinez specifically asked the victim if anyone was behaving badly toward her and the victim only told Martinez about a girl who had bitten the victim's chest. If Martinez was the sole outcry witness and the victim had lied to her, it would weigh against the statement's reliability. However, in the case at bar, the victim spoke to Elvia, Maria, and Martinez individually and repeated the same account of defendant "put[ting] his eggs in her parts." Thus, as noted above, the victim consistently and spontaneously made the same statement to three different people, which weighs in favor

-21-

of finding the victim's statements reliable. Consequently, we cannot say that the trial court abused its discretion by finding the victim's statements reliable despite the victim's behavior before Martinez.

¶ 101 Defendant claims that the victim's delay in her initial outcry to Elvia weighs against the trial court's finding of reliability. However, defendant agrees that a "delay in reporting abuse or initial denials of abuse will not automatically render a victim's statements inadmissible under section 115-10." *Zwart*, 151 Ill. 2d at 46. Here, the victim made the initial outcry to Elvia approximately two weeks after moving in with her. It is not clear from the record how often the victim had been alone with Elvia since moving in; Elvia testified that defendant normally babysat the victim and that she only filled in when both Elizabeth and defendant were unavailable. Additionally, delays of longer than two weeks have been found acceptable in determining a statement's reliability under section 115-10. See, *e.g.*, *People v. Jahn*, 246 Ill. App. 3d 689, 704 (1993) (statements made nearly eight months after the incident); *People v. Anderson*, 225 Ill. App. 3d 636, 649 (1992) (statements made a month after the victim left the home of his abusers and after denying any sexual abuse more than 20 times over the course of a year). Thus, without more, we cannot say that the two weeks that passed prior to the victim making her initial outcry cause her statements to be unreliable.

¶ 102 Next, defendant argues that the victim used age-inappropriate terminology, which weighs against a finding of reliability. Defendant agrees that the victim's lack of terminology for her own vagina and buttocks was age-appropriate, but argues that the use of the term "huevos," or "eggs," was age-inappropriate and calls into question the reliability of her statements. Martinez testified that the victim had age-appropriate use of the terminology that she used, and that the term "huevos," or "eggs," is widely used in Mexico, including in movies, television, and songs. Martinez testified that it is an adult term, "but if the children listen to them they will use those words" and further testified that "it is very common" to hear other Spanish-speaking children the victim's age use the word to describe the penis. Accordingly, the victim's description of defendant's "eggs" does not weigh against the statements' reliability.

¶ 103 Defendant argues that defendant had a motive to fabricate her account, since defendant was not the victim's father and the victim testified that she did not want to live with him; she also made the first two outcry statements to Elvia and Maria, two individuals who were estranged from the victim and Elizabeth while they were living with defendant and "may have disapproved of" defendant. At trial, the victim testified that defendant was not her father and that prior to living with defendant, she lived with Elizabeth and her father; the victim testified that she did not want to live with defendant and was afraid of defendant. We cannot say that this testimony indicates a motive to fabricate the account against defendant, nor is there any indication in the record that Maria or Elvia "disapproved" of defendant, or that the victim knew of this disapproval such that she would fabricate a story to take advantage of it.

¶ 104 Defendant also points to the victim's fabrication of the allegations against Elizabeth, and the fact that the victim testified that Elvia told her to lie, as weighing against the statements' reliability. However, as noted, the allegations against Elizabeth occurred nearly a year after the events in the case at bar. Additionally, the record only indicates that the victim told

-22-

Martinez about Elizabeth's alleged conduct; here, by contrast, the victim made three separate statements to three different people. Most importantly, even if this fact weighed against the statements' reliability, the other factors all weigh in favor of reliability. Consequently, we cannot say the trial court's decision to admit the statements pursuant to section 115-10 was an abuse of discretion.

¶ 105        As a final matter, defendant argues that the fact that the victim's interview with Martinez was not recorded makes the statement unreliable. Defendant is correct that recording interviews is preferred whenever possible. See *Simpkins*, 297 Ill. App. 3d at 677-78 (noting that recording an interview "provides the best evidence that no adult prompting or manipulation occurred"). However, here, Martinez testified that at the time she interviewed the victim, the CAC did not have the capability to record interviews. Thus, this is not a case where Martinez could have recorded the interview, but chose not to; instead, Martinez was unable to record the interview because the CAC did not have the capability. Accordingly, the lack of a recording does not render the statement unreliable and we affirm the trial court's decision.

¶ 106                                     III. Medical Opinion

¶ 107        Defendant next argues that he is entitled to a new trial because the trial court erred in permitting Dr. Karimi to testify that her medical findings were consistent with vaginal and anal penetration, an opinion for which defendant argues there was no foundation laid. It is left to the discretion of the trial court to determine whether to permit the introduction of an expert's testimony. *People v. Mack*, 128 Ill. 2d 231, 250 (1989). However, "the admission of an expert's testimony requires an adequate foundation establishing that the information upon which the expert bases his opinion is reliable." *People v. Bush*, 214 Ill. 2d 318, 333 (2005). "It is the function of the trial court to determine whether the foundational requirements have been met. That determination presents a question of law." *People v. Safford*, 392 Ill. App. 3d 212, 221 (2009). As such, it is reviewed *de novo*. *Safford*, 392 Ill. App. 3d at 221. *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 108        Defendant acknowledges that he has forfeited this claim by failing to object during trial or raise the issue in his posttrial motion. The Illinois Supreme Court has held that a "defendant must both specifically object at trial and raise the specific issue again in a posttrial motion to preserve any alleged error for review." *People v. Woods*, 214 Ill. 2d 455, 470 (2005); *People v. Piatkowski*, 225 Ill. 2d 551, 564 (2007).

¶ 109        Nevertheless, defendant urges us to review his claim under plain error. "[T]he plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Piatkowski*, 225 Ill. 2d at 565. In a plain error analysis, "it is the defendant who bears the burden of persuasion." *Woods*, 214 Ill. 2d at 471. However, in order

to find plain error, we must first find that the trial court committed some error. *Piatkowski*, 225 Ill. 2d at 565 ("the first step is to determine whether error occurred").

¶ 110    In the case at bar, defendant argues that there was no foundation or factual basis for Dr. Karimi's opinion that the victim's lack of physical injury was consistent with vaginal and anal penetration and so her opinion should not have been admitted. We do not find this argument persuasive. Dr. Karimi testified extensively about the basis for her conclusion, and was cross-examined thoroughly on the issue. Dr. Karimi testified that in her experience of examining over 3,000 patients, over 95% of the time, the genital examination is normal, and explained that penetration was still consistent with a normal genital evaluation:

> "It's very normal to have a normal exam in cases of allegations of child sexual abuse. Even though there are genital-to-genital contact, genital-to-genital penetration, genital-anal contact, genital-anal penetration, we can still have normal examination. It's not surprising. More than 95 percent of the time, a normal exam."

Dr. Karimi testified that this could still be the case where an adult male had inserted his penis into a five-year-old girl's vagina because of the flexibility and elasticity of the vagina and hymen, as well as its capability of healing quickly without leaving scars; Dr. Karimi further testified that "penetration" could include rubbing the penis between the labia and not necessarily intravaginal penetration.

¶ 111    Dr. Karimi also testified that it was not unusual for there to be no tear in the victim's vaginal or hymen area. Dr. Karimi then testified:

> "Q. So is it your testimony that trauma to the vaginal area can occur with injury? It's possible to have injury?
>
> A. Correct.
>
> Q. But is it also your testimony that trauma can occur to the vaginal area and present no injury whatsoever?
>
> A. Correct.
>
> Q. It doesn't matter whether there are signs of injuries or not. That would still be consistent with the allegation of genital-to-genital contact with penetration in this case; is that right?
>
> A. Yes, correct."

¶ 112    Similarly, Dr. Karimi testified that a normal anal exam was even more common than a normal vaginal exam due to its flexibility and fast healing, and that out of her 3,000 patients, only one had an anal finding. She further testified:

> "Q. If there were anal penetration as late as February 2008, how is that–the fact that there was penetration, how is that consistent with you not finding any injury to the anal area on March 18th?
>
> A. That's not unusual to have no findings, especially anal findings, during that examination in March of 2008.
>
> Q. So is it your testimony that trauma to the anal area can occur with signs of injury?
>
> A. Yes.

Q. And is it also your testimony that trauma can occur to the anal area without any sign of injury whatsoever?

A. Correct.

Q. It doesn't matter whether there were signs of injuries in this case. It still would be consistent with [the victim] having genital-to-anal contact with possible penetration?

A. Correct."

Dr. Karimi then opined, within a reasonable degree of medical certainty, that the victim's "constellation of medical findings was consistent with child sexual abuse, genital-genital contact, genital-anal contact, genital-genital penetration, genital-anal penetration." Dr. Karimi further testified that her opinion was "[b]ased on [her] experience, [her] education, based on literature, other people who had the same experience." We find that Dr. Karimi's testimony included the basis for her conclusion that the victim's lack of physical trauma was consistent with vaginal and anal penetration, and accordingly find no error in admitting her testimony.

¶ 113    We also note that defendant's argument that the jury would have put great weight on Dr. Karimi's opinion does not take into account the fact that, on cross-examination, Dr. Karimi also testified that a lack of physical injury could be consistent with a child who had not been abused. On cross-examination, Dr. Karimi repeated that all of the victim's tests were "absolutely normal." Dr. Karimi further testified:

"Q. *** [T]hese findings are completely consistent with a child who has never been sexually abused; isn't that correct?

A. A normal exam doesn't mean that a child is abused or not abused. I don't know. I wasn't there.

Q. I understand, but if it's a normal exam, that's completely consistent with a child who was never sexually abused; isn't that correct, a normal exam?

A. A normal exam is consistent with–really, if there is any history of child sexual abuse, it might or might not be. I don't know.

***

But in this case there was a history of child sexual abuse. Well, now when we have the history and normal exam, I'm not surprised because most of the time the kids who have the history of sexual abuse have the normal examination.

And I'm not the one who determines that the kids have been sexually abused or not because there are investigators, there are DCFS workers. I mean–

***

–my job as a physician–I'm sorry. My job as a physician is just to look at the child medically to see if they are healthy or not, and she was healthy.

Q. Exactly.

And that would be consistent with a child who was not sexually abused?

A. A child who is not sexually abused can have [a] normal examination or not have a normal examination for whatever reason.

Q. [The victim], her examination was consistent with a child who had not been sexually abused; isn't that true?

* * *

A. [The victim's] examination was normal, including general exam and genital-anal exam. And a kid who hasn't been sexually abused can have a normal examination, yes, and any kid who has been sexually abused can have a normal exam, too.

So she's which one of them? I don't know.

But it's another part of the investigation that has nothing to do with my job."

Thus, defense counsel had the opportunity to cross-examine Dr. Karimi as to the basis for her opinion, and did so, even eliciting the testimony that a lack of physical evidence could also be consistent with a child who had not been sexually abused. Consequently, the jury was able to consider all of Dr. Karimi's testimony and determine what weight it should receive, and we cannot agree with defendant's contention that the jury was overpersuaded by Dr. Karimi's testimony.

¶ 114    Moreover, even if Dr. Karimi's testimony should not have been admitted, the error does not rise to the level of plain error because the evidence was not closely balanced. In the case at bar, the victim testified at trial that defendant abused her, and Elvia, Maria, and Martinez all testified that the victim had earlier made statements to them about defendant's abuse. Additionally, defendant made a statement to police in which he admitted to sexually abusing the victim. Thus, we cannot say that Dr. Karimi's testimony would have tipped the scales in favor of finding defendant guilty and, accordingly, affirm the trial court.

¶ 115    As a final matter, we note that defendant argues that defense counsel was ineffective for failing to object to Dr. Karimi's testimony. The Illinois Supreme Court has held that, to determine whether a defendant was denied his or her right to effective assistance of counsel, an appellate court must apply the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Colon*, 225 Ill. 2d 125, 135 (2007) (citing *People v. Albanese*, 104 Ill. 2d 504 (1984) (adopting *Strickland*)). Under *Strickland*, a defendant must prove both (1) his attorney's actions constituted errors so serious as to fall below an objective standard of reasonableness; and (2) absent these errors, there was a reasonable probability that his trial would have resulted in a different outcome. *People v. Ward*, 371 Ill. App. 3d 382, 434 (2007) (citing *Strickland*, 466 U.S. at 687-94).

¶ 116    Under the first prong of the *Strickland* test, the defendant must prove that his counsel's performance fell below an objective standard of reasonableness "under prevailing professional norms." *Colon*, 225 Ill. 2d at 135; *People v. Evans*, 209 Ill. 2d 194, 220 (2004). Under the second prong, the defendant must show that, "but for" counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. *Colon*, 225 Ill. 2d at 135; *Evans*, 209 Ill. 2d at 220. "[A] reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome–or put another way, that counsel's deficient performance rendered the result of the trial unreliable or fundamentally unfair." *Evans*, 209 Ill. 2d at 220; *Colon*, 225 Ill. 2d at 135. In other words, the defendant was prejudiced by his attorney's performance.

¶ 117    To prevail, the defendant must satisfy both prongs of the *Strickland* test. *Colon*, 225 Ill. 2d at 135; *Evans*, 209 Ill. 2d at 220. "That is, if an ineffective-assistance claim can be disposed of because the defendant suffered no prejudice, we need not determine whether counsel's performance was deficient." *People v. Graham*, 206 Ill. 2d 465, 476 (2003). We do not need to consider the first prong of the *Strickland* test when the second prong cannot be satisfied. *Graham*, 206 Ill. 2d at 476.

¶ 118    In the case at bar, we cannot say that defense counsel was ineffective. As we noted, Dr. Karimi's testimony was properly admitted. Thus, defense counsel's performance in failing to object to her testimony did not fall below an objective standard of reasonableness, and defendant was not prejudiced by the failure to object.

¶ 119                              IV. Fitness Hearing

¶ 120    Defendant's final argument on appeal is that his due process rights were violated when the trial court ordered a fitness hearing, but no such hearing was conducted and no independent judicial determination of defendant's fitness was made. Defendant acknowledges that he did not raise this issue in a posttrial motion, but asks us to review his claim for plain error. A trial court's failure to conduct a meaningful fitness hearing "may be reviewed as plain error" because "it concerns a substantial right." *People v. Contorno*, 322 Ill. App. 3d 177, 180 (2001) (citing *People v. Basler*, 193 Ill. 2d 545, 549 (2000)).

¶ 121    As noted, when a defendant has failed to preserve an error for review, we may still review for plain error. *People v. Piatkowski*, 225 Ill. 2d 551, 562-63 (2007); Ill. S. Ct. R. 615(a) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court."). "[T]he plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Piatkowski*, 225 Ill. 2d at 565; *People v. Woods*, 214 Ill. 2d 455, 471 (2005). However, in order to find plain error, we must first find that the trial court committed some error. *Piatkowski*, 225 Ill. 2d at 565 ("the first step is to determine whether error occurred"). Defendant carries the burden of persuasion under both prongs of the plain error rule. *People v. Lewis*, 234 Ill. 2d 32, 43 (2009).

¶ 122    A defendant is presumed fit to stand trial (725 ILCS 5/104-10 (West 2000)) and is entitled to a fitness hearing "only when a *bona fide* doubt of his fitness to stand trial or be sentenced is raised." *People v. McCallister*, 193 Ill. 2d 63, 110 (2000) (citing *People v. Johnson*, 183 Ill. 2d 176, 193 (1998)); *People v. Eddmonds*, 143 Ill. 2d 501, 512 (1991). A defendant is unfit "if, because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense." 725 ILCS 5/104-10 (West 2000).

¶ 123    "Relevant factors which a trial court may consider in assessing whether a *bona fide* doubt of fitness exists include a defendant's 'irrational behavior, his demeanor at trial, and any

prior medical opinion on competence to stand trial.' [Citation.] The representations of defendant's counsel concerning the competence of his client, while not conclusive, are another important factor to consider." *Eddmonds*, 143 Ill. 2d at 518 (quoting *Drope v. Missouri*, 420 U.S. 162, 180 (1975)). However, "there are 'no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated.' " *Eddmonds*, 143 Ill. 2d at 518 (quoting *Drope*, 420 U.S. at 180). Accordingly, the question of whether a *bona fide* doubt of fitness exists is a fact-specific inquiry (*People v. Tapscott*, 386 Ill. App. 3d 1064, 1077 (2008)) and is generally a matter within the discretion of the trial court (*People v. Sandham*, 174 Ill. 2d 379, 382 (1996)). As noted, " '[a]n abuse of discretion occurs when the [court's] ruling is arbitrary, fanciful, or unreasonable, or when no reasonable person would take the same view.' " *Sharp*, 391 Ill. App. 3d at 955 (quoting *People v. Robertson*, 312 Ill. App. 3d 467, 469 (2000)).

¶ 124     In the case at bar, the parties disagree as to whether the trial court ordered a fitness hearing pursuant to section 104-11(a) or 104-11(b) of the Code. Sections 104-11(a) and 104-11(b) provide, in relevant part:

> "(a) The issue of the defendant's fitness for trial, to plead, or to be sentenced may be raised by the defense, the State or the Court at any appropriate time before a plea is entered or before, during, or after trial. When a bona fide doubt of the defendant's fitness is raised, the court shall order a determination of the issue before proceeding further.
>
>     (b) Upon request of the defendant that a qualified expert be appointed to examine him or her to determine prior to trial if a bona fide doubt as to his or her fitness to stand trial may be raised, the court, in its discretion, may order an appropriate examination. However, no order entered pursuant to this subsection shall prevent further proceedings in the case." 725 ILCS 5/104-11 (West 2006).

Section 104-11(a) "places a mandatory burden on the trial judge to order a determination of a defendant's fitness when a *bona fide* doubt of that fitness is raised." *People v. Mitchell*, 189 Ill. 2d 312, 330 (2000). By contrast, if the trial court has not been convinced that a *bona fide* doubt of fitness has been raised, section 104-11(b) gives a court the discretion to grant the defendant's request for appointment of an expert to aid in that determination. *People v. Hanson*, 212 Ill. 2d 212, 217 (2004). "In sum, the primary distinction between sections 104-11(a) and 104-11(b) is that section 104-11(a) ensures that a defendant's due process rights are not violated when the trial court has already found *bona fide* doubt to have been raised, while section 104-11(b) aids the trial court in deciding whether there is a *bona fide* doubt of fitness." *Hanson*, 212 Ill. 2d at 218.

¶ 125     In the case at bar, defendant argues that the trial court implicitly found a *bona fide* doubt of defendant's fitness to stand trial and, therefore, a fitness hearing was required under section 104-11(a) and the absence of one was reversible error. The State, however, argues that the trial court did not have a *bona fide* doubt of defendant's fitness to stand trial but merely ordered a fitness evaluation in its discretion under section 104-11(b) when defense counsel indicated that he had a *bona fide* doubt of defendant's fitness; thus, it argues that the absence of a fitness hearing does not result in reversible error.

¶ 126    In order to determine whether the trial court ordered a fitness hearing pursuant to section 104-11(a) or 104-11(b), it is helpful to recount the proceedings before the court. On January 12, 2009, APD Kugler informed Judge Scotillo in Rolling Meadows that he had attempted to speak with defendant several times about the case and had a *bona fide* doubt of defendant's fitness; consequently, defense counsel requested a fitness evaluation, which the court ordered.

¶ 127    On March 5, 2009, after a letter from Dr. Kulik was received stating that he was unable to render a fitness opinion because defendant was uncooperative during the interview, APD Kugler requested that defendant be reevaluated, since he still had a *bona fide* doubt of defendant's fitness. After speaking with defendant, APD Calvin Aguilar, APD Kugler's partner on the case, agreed, stating that he also had a *bona fide* doubt of defendant's fitness based on defendant's responses. The trial court entered another court order for an evaluation of defendant's fitness to stand trial, telling APD Kugler that "[w]e have to have a hearing if you have a bona fide doubt."

¶ 128    On April 23, 2009, after reading a letter in which Dr. Kulik stated that he attempted to evaluate defendant for a second time and was unable to render an opinion due to defendant's continued refusal to cooperate, the trial court suggested the matter be set for trial, but APD Kugler stated that "I'm unable to represent this defendant. I still have a bona fide doubt as to his fitness. I'm not a psychiatrist. All that I know is that I have a client who is not working with me. I'm unable to work with this client." The State stated that in light of APD Kugler's statement that he had a *bona fide* doubt of defendant's fitness, the matter needed to be set for a fitness hearing. The trial court entered an order transferring defendant's case to 26th and California for the purpose of a fitness hearing.

¶ 129    On May 12, 2009, another fitness evaluation was ordered by Judge Joseph Claps at 26th and California. After several attempts to evaluate defendant and several continuances, on September 18, 2009, a letter from Dr. Seltzberg to the trial court was received in which Dr. Seltzberg concluded within a reasonable degree of medical and psychiatric certainty, that defendant was fit to stand trial based on her review of the available records, including psychological testing and clinical examinations.

¶ 130    On the same day, the parties came before the court for the fitness hearing. The court and APD Arthur Willis engaged in the following colloquy:

    "APD WILLIS: Your Honor, this matter was transferred to us for fitness testing back in May of this year. We finally have a report from Dr. Seltzberg. The report states that Mr. Garcia is fit to stand trial.

    THE COURT: You don't want a hearing?

    APD WILLIS: Fitness is presumed, Judge. There's no hearing."

The case was transferred back to Judge Scotillo in Rolling Meadows the same day.

¶ 131    The record indicates that after the case was transferred back to Judge Scotillo, the parties and the trial court were under the impression that a fitness hearing had been held and that defendant had been found fit to stand trial. On October 26, 2009, the parties again came before the court, and the ASA informed the court that, in reviewing the court file, she noticed that Forensic Clinical Services had found defendant fit to stand trial, but had not examined

him for ability to understand his *Miranda* rights or sanity at the time of the offense. In discussing whether the court should enter another order, the court noted that "because the public defender indicated there was a bona fide doubt as to fitness, a fitness hearing had to be held," and APD Naranjo stated that "now that the fitness hearing has been had, Judge, and he has been found fit, I believe we're in a better position to speak to him regarding the other issues we need evaluated." The court reordered evaluations for the issues of sanity and *Miranda*, and Dr. Seltzberg sent the court a letter opining, to a reasonable degree of medical and psychiatric certainty, that defendant was legally sane at the time of the offense.

¶ 132   After examining the record, we agree with the State that the trial court ordered a fitness hearing pursuant to section 104-10(b) and not section 104-10(a) and, accordingly, the absence of a fitness hearing was not reversible error under the facts of this case. The trial court's comments make it clear that it ordered the fitness hearing because defense counsel had a *bona fide* doubt of defendant's fitness and the trial court did not indicate that it ever had a *bona fide* doubt itself. For instance, even after the case had been transferred back to Judge Scotillo, he noted that "because *the public defender indicated* there was a bona fide doubt as to fitness, a fitness hearing had to be held." (Emphasis added.) Additionally, prior to transferring the case to 26th and California, the trial court suggested proceeding with the trial and setting a trial date when defendant failed to cooperate with Dr. Kulik a second time; it was defense counsel who again stated he had a *bona fide* doubt of defendant's fitness and the State who agreed that a hearing should be held. This leads to the conclusion that it was not the trial court that had a *bona fide* doubt of defendant's fitness such that a fitness hearing was required under section 104-11(a). We cannot agree with defendant that "it is clear in this case that the court shared Kugler's concern about [defendant's] fitness, or at least accepted Kugler's opinion that a *bona fide* doubt existed, and was not merely humoring him." Defendant points to the fact that the trial court transferred the case to 26th and California in order to have a fitness hearing prior to proceeding further as demonstrating that the trial court did, in fact, have a *bona fide* doubt of defendant's fitness. We do not find this argument persuasive.

¶ 133   We agree with the State that the Illinois Supreme Court case of *People v. Hanson*, 212 Ill. 2d 212 (2004), is instructive. In that case, our supreme court considered whether "the grant of defendant's request for a fitness examination implicitly signaled the trial court's belief that there was a *bona fide* doubt as to defendant's fitness, necessitating a fitness hearing." *Hanson*, 212 Ill. 2d at 216. The court noted that the defendant was arguing that an examining expert was appointed under section 104-11(a) of the Code, while the State argued that the expert was appointed under section 104-11(b), and explained the difference between the two sections, stating that "[i]n sum, the primary distinction between sections 104-11(a) and 104-11(b) is that section 104-11(a) ensures that a defendant's due process rights are not violated when the trial court has already found *bona fide* doubt to have been raised, while section 104-11(b) aids the trial court in deciding whether there is a *bona fide* doubt of fitness." *Hanson*, 212 Ill. 2d at 218. The court first pointed out that the defendant's motion for a fitness evaluation did not make any reference at all to either section 104-11(a) or 104-11(b), belying the defendant's claim that the motion was filed pursuant to section 104-11(a). *Hanson*, 212 Ill. 2d at 219. The court then distinguished the appellate court's reliance on

*People v. Cleer*, 328 Ill. App. 3d 428 (2002), in part because, in that case, the defense counsel had expressly sought a fitness hearing pursuant to section 104-11(a). *Hanson*, 212 Ill. 2d at 220-21. "More importantly," however, the court distinguished the defendant's reliance on *Cleer* because "defendant's interpretation of *Cleer* directly conflicts with our pronouncement in *Eddmonds*, [citation]." *Hanson*, 212 Ill. 2d at 221.

¶ 134    The court stated:

"In *Eddmonds*, this court unequivocally stated that 'there are "no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated." ' [Citation.] The mere act of granting a defendant's motion for a fitness examination cannot, by itself, be construed as a definitive showing that the trial court found a *bona fide* doubt of the defendant's fitness. If this were not true, the factors enumerated in *Eddmonds* would be rendered superfluous and irrelevant. Thus, defendant's argument is contrary to our unambiguous statement in *Eddmonds*, [citation]. The appellate court erroneously relied on *Cleer* to conclude in this case that 'upon accepting a motion for a fitness hearing and appointing a qualified expert, the trial court implicitly concludes that a *bona fide* doubt as to defendant's fitness exists.' To the extent that *Cleer* may be read as holding that the grant of a motion for fitness examination, by itself, required the trial court to hold a fitness hearing, it is overruled." *Hanson*, 212 Ill. 2d at 222 (quoting *Eddmonds*, 143 Ill. 2d at 518, quoting *Drope*, 420 U.S. at 180)).

¶ 135    Our supreme court also found unpersuasive the defendant's argument that the trial court must have found a *bona fide* doubt of the defendant's fitness because the trial court scheduled a fitness hearing in response to defense counsel's request for a fitness evaluation. The court noted:

"It is equally likely that the court was simply attempting to manage its docket efficiently and, thus, permit a timely fitness hearing if the court should later determine there was a *bona fide* doubt after reviewing the expert's report. We cannot rely on defendant's speculative assertions in the face of his 'burden of proving that, at the time of trial, there were facts in existence which raised a real, substantial and legitimate doubt as to his mental capacity to meaningfully participate in his defense and cooperate with counsel.' " *Hanson*, 212 Ill. 2d at 223 (quoting *Eddmonds*, 143 Ill. 2d at 518).

¶ 136    In the case at bar, we cannot say that because the trial court ordered a fitness hearing in response to defense counsel's request means that the trial court also had a *bona fide* doubt of defendant's fitness. As noted, none of the trial court's comments or conduct supports this conclusion. Thus, we cannot find that there was any error in the trial court's proceeding with defendant's trial in the absence of a fitness hearing and affirm the trial court.

¶ 137    We also note that the record indicates that even if a fitness hearing had been held, defendant would have been found fit. Dr. Seltzberg's report found that defendant was fit to stand trial, and defendant has pointed to no evidence to support a claim that he was not fit to stand trial other than defense counsel's initial statements. Thus, we cannot find that the record leaves a *bona fide* doubt of defendant's fitness to stand trial.

¶ 138                                V. Vehicle Code Fines and Fees

¶ 139      As a final matter, defendant argues that his total balance of fines and fees should be reduced by $55. Defendant claims that the trial court was not statutorily authorized to assess a $35 traffic court supervision fee or a $20 serious traffic violation fine, since he was not convicted of any crimes under the Illinois Vehicle Code (625 ILCS 5/1-100 *et seq.* (West 2006)). The State agrees that defendant's total balance of fines and fees should be reduced by $55, as do we.

¶ 140                                      CONCLUSION

¶ 141      First, we find that the State proved defendant guilty beyond a reasonable doubt where the victim and three outcry witnesses testified and defendant confessed to the crime. Second, we find that the trial court did not abuse its discretion in admitting the victim's out-of-court statements into evidence because they contained sufficient safeguards of reliability. Third, we find that the trial court did not abuse its discretion in permitting the State's expert to testify that a lack of physical trauma was "consistent" with sexual abuse. Fourth, we find that defendant's due process rights were not violated because the trial court did not find a *bona fide* doubt of defendant's fitness to stand trial and therefore was not required to conduct a fitness hearing. Fifth, we order the mittimus corrected to reflect a reduction of defendant's total balance of fees and fines by $55.

¶ 142      Affirmed.