2020 IL App (1st) 180084

No. 1-18-0084

Order filed May 11, 2020

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 4856 |
| | ) | |
| ALFONSO BARBOZA-ZARAGOZA, | ) | Honorable |
| | ) | Gregory R. Ginex, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE GRIFFIN delivered the judgment of the court.
Justices Hyman and Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm defendant's convictions for predatory criminal sexual assault of a child and aggravated criminal sexual abuse where the evidence was sufficient for the trial court to find that the State had proven his guilt beyond a reasonable doubt.

¶ 2    Following a bench trial, defendant Alfonso Barboza-Zaragoza was found guilty of two counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2014) and two counts of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(c)(1) (West 2014). He was sentenced to an aggregate term of 18 years' imprisonment: consecutive terms of seven years for

each count of predatory criminal sexual assault of a child and four-year terms for each count of aggravated criminal sexual abuse to be served concurrently to each other, but consecutive to his terms for predatory criminal sexual assault. On appeal, he contends that the State's evidence was insufficient to sustain his convictions. For the following reasons, we affirm.

¶ 3     Defendant was charged by indictment with two counts of predatory criminal sexual assault of a child (counts 1 and 2) and 19 counts of aggravated criminal sexual abuse (counts 3 through 21).[1] All of the counts were premised upon defendant's alleged abuse of J.C., his step-granddaughter, who was between the ages of 8 and 9 years old at the time of the alleged offenses. The counts were premised upon three separate incidents of abuse that allegedly occurred during the summer of 2014, around Christmas 2014, and Thanksgiving weekend 2015. Specifically, counts 3, 16, 17, 18, 19, 20 and 21 were based on conduct that allegedly occurred between May 1, 2014 and September 30, 2014. Counts 2, 10, 11, 12, 13, 14, and 15 were based on conduct alleged to have occurred between December 24, 2014 and December 28, 2014. Counts 1, 4, 5, 6, 7, 8, and 9 were based on conduct alleged to have occurred between November 26, 2015 and November 29, 2015.

¶ 4     Before trial, the State moved for a hearing pursuant to section 115-10 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10(b)(1) (West 2014)) to determine the admissibility of certain out-of-court statements by J.C. describing the alleged abuse. These statements included the contents of J.C.'s videotaped forensic interview, as well as separate statements by J.C. to her paternal grandmother, Maria Cruz. The court conducted that hearing on September 22, 2017.

---

[1] Defendant was also charged with one count of sexual exploitation of a child (count 22), but the State nol-prossed that count before trial.

¶ 5    At the hearing, Alma Llamas testified that she worked as a forensic interviewer for the Child Advocacy Center (CAC) in Broadview, Illinois. On March 2, 2016, Llamas conducted a forensic interview with J.C.  She and J.C. were the only people in the room, although the room had a two-way mirror so the interview could be observed by police, Department of Children and Family Services (DCFS) and an assistant state's attorney. Llamas testified that J.C. told her that she was 9 years old and that she lived with her mother. Llamas asked whether J.C. knew the difference between the truth and a lie, and J.C. indicated that she did. When Llamas asked J.C. if she knew why she was there, J.C. answered that "she was there to talk about [how] her grandma's husband touched her."

¶ 6    Llamas showed J.C. an anatomical drawing and asked J.C. to point to it to indicate where she had been touched. J.C. indicated that defendant had touched his mouth to her vagina on three occasions, and that he had also kissed her face and had touched her nipples under her clothes. J.C. told Llamas the incidents occurred on a bed in her grandmother's home. J.C. said that "Alfonso would grab her, sit her on the bed, her legs were hanging down and her pants were halfway to her knees, along with her panties." J.C. said that defendant told her that she or her family would be hurt if she told anyone. Llamas also testified that J.C. told her that defendant asked her to "touch his private part." When J.C. refused, defendant told her that "one day [she] would do it." J.C. indicated that there were three separate occurrences of abuse, in summer 2014, around Christmas 2014, and around Thanksgiving 2015. The parties stipulated that Llamas' interview with J.C. was videotaped, and a copy was submitted for the trial court to review.

¶ 7    J.C.'s paternal grandmother, Maria Veronica Cruz, also testified at the section 115-10 hearing.[2] In 2016, Cruz lived with her son, who is J.C.'s father. Cruz testified that she had a close relationship with J.C. and saw her about twice a month. In January 2016, Cruz began to notice that J.C. was acting "sad" and "different." J.C. stayed with Cruz the weekend of February 20 and 21, 2016. During that visit, J.C. asked Cruz, "can I trust you with something?" J.C. began to cry and told Cruz that defendant had been "touching her private parts" and indicated that she was referring to her vagina. J.C. told Cruz that "Alfonso took her to the room," took her blouse off and "started to kiss her chest and mouth." J.C. indicated to Cruz that this happened the weekend of Thanksgiving 2015.  Cruz testified that J.C. stated that the improper touching had happened "a lot of times."

¶ 8    J.C. also indicated to Cruz that defendant had removed her clothes and licked and kissed J.C.'s "private part." According to Cruz, J.C. also said that defendant had put his penis in her mouth. Cruz also testified that J.C. indicated that defendant put something into J.C.'s vagina, which caused her pain, but J.C. did not know what it was. After this conversation, Cruz brought J.C. to the home of J.C.'s mother, Maribel Muniz. After J.C. told her parents what happened to her, they contacted police.

¶ 9    At the conclusion of the section 115-10 hearing, the court noted that it had watched the video of the interview with J.C. and found J.C. to be "very bright," "articulate" and "very specific." The court noted:

> "[o]n the video while seated at the table with Ms. Llamas, she demonstrated and
> pointed to her vagina where the defendant touched her in her private parts. She

---

[2] Cruz acknowledged that she is also known as Maria Cruz Charo.

indicated he pulled her pants down. She answered the questions directly without hesitation.

As a matter of fact, there was one portion of the video where the young woman actually corrected the Child Advocacy worker with specific details detailing what exactly occurred. She explained what happened. * * *

She did not cry, was not really upset, and was very direct and forward in her testimony. She was able to accurately point to body parts in the drawings and to explain exactly what those parts were. I find her testimony extremely credible."

With respect to Cruz, the court stated that "although there were some indications of a very emotional testimony, for the most part she corroborated the statement." After finding "sufficient safeguards of reliability," the court granted the State's motion to admit Llamas' forensic interview, as well as Cruz's testimony.

¶ 10 At trial, J.C. testified that she was born in April 2006 and was eleven years old. She stated that defendant is married to her maternal grandmother, Felicitas Ochoa. When J.C. was asked if she knew why she was there, she answered: "Because my step-grandfather was touching me." She proceeded to describe instances in which defendant touched her in the bedroom of the home he shared with Ochoa.

¶ 11 J.C. described an incident that occurred in the summer of 2014, on a day that she went to a water park with her brother. After returning from the park, she and her brother went to Ochoa and defendant's home. While her brother was playing outside with their uncle, defendant grabbed J.C. by the arm and pulled her into the bedroom. Defendant set her on the bed, pulled down her pants and underwear, and "kissed [her] private." Defendant also kissed her face and touched her nipples.

J.C. further testified that defendant unbuckled his pants and told her to kiss his "private front parts." She told him "no" and he said "okay, but you will some day." Defendant told her "not to tell anyone, or else he would hurt [her] and [her] family."

¶ 12    J.C. also described incidents that occurred around Christmas 2014 and Thanksgiving 2015. Asked about the Christmas incident, she recalled that she was at Ochoa and defendant's home when she went to the kitchen to get some milk. Defendant pulled her into the bedroom by her upper arm the same way he had in the summer 2014 incident. Defendant then sat her down on the bed and lowered her pants and underwear. He then "kissed [her] private," kissed her face and "put his hand under [her] shirt" and touched her nipples. She recalled that he said "do not tell anybody, or else I will hurt you and your family." Although there were a number of other people in the house, J.C. did not tell anyone because she was "terrified" that defendant would hurt her or her family.

¶ 13    J.C. also described a third incident shortly after Thanksgiving 2015, when she was nine. J.C. recalled that she and her brother visited Ochoa's home for Thanksgiving and had "slept over until Sunday." J.C. first testified that she was in the kitchen "eating a strawberry" when she was "pulled into the bedroom" while her brother and uncle were playing outside. She then testified that her brother and uncle were playing a video game in the living room when defendant touched her in the bedroom. J.C. stated that she was playing with one of the family's dogs when "[t]he ball slipped out of my hand, rolled down the hallway, and went under the bed into my grandma Felicitas' room." The dog went under the bed, and J.C. followed it. While J.C. was under the bed, she "saw [defendant's] feet stepping in" wearing boots. Defendant told her to come out, but she

refused. Defendant then "stuck his hand in the hole between the frame and the mattress," "put his hand in [her] shirt" and touched her nipple.

¶ 14    Defendant again told her to come out, and she complied because she "thought something might happen." He then sat her down on the bed, pulled down her pants and underwear and "kissed [her] private." He also squeezed her nipple and kissed her on the forehead, cheeks, and chin. Defendant lowered his pants and told J.C. to "kiss" his "private part pee comes out of." She said no, and he said "okay. But you will kiss it some day." She did not tell anyone at that time because she was "terrified." In February 2016, she told her paternal grandmother (Cruz) what happened, and Cruz helped J.C. tell her parents.

¶ 15    J.C. recalled telling Llamas about what happened to her. Without objection, the video of her forensic interview with Llamas was admitted into evidence. J.C. was shown the anatomical drawings that Llamas used in the interview. J.C. confirmed that Llamas had marked the areas where J.C. told her that she had been touched by defendant. J.C. testified that defendant touched her in the same areas of her body during each of the three incidents in summer 2014, around Christmas 2014, and Thanksgiving 2015.

¶ 16    On cross-examination, J.C. agreed that the last incident actually happened on the day after Thanksgiving in 2015, after she slept over at defendant and Ochoa's house. She did not remember what she was wearing on Thanksgiving. J.C. denied that defendant ever put his penis in her mouth, and she denied telling Cruz that he had done so.

¶ 17    The parties stipulated that Cruz would offer the same testimony she gave during the section 115-10 hearing. The parties also stipulated that the alleged Thanksgiving weekend incident would have occurred between November 26, 2015 and November 29, 2015, and that the Christmas 2014

incident would have occurred between December 24 and December 28, 2014. The State rested following those stipulations.

¶ 18    The defense called Joseph Kelly, deputy chief of the Stone Park Police. In February 2016, he investigated the case and went to the alleged crime scene, but he did not find any physical evidence to support the charges against defendant. On cross-examination, Kelly agreed that the lack of physical evidence did not mean that there had been no abuse. He also agreed that he first learned of the alleged crimes on February 21, 2016, whereas the last alleged incident was around Thanksgiving 2015.

¶ 19    Maribel Muniz, J.C.'s mother, testified as a defense witness. Muniz acknowledged that in the fall of 2013, she filed a lawsuit against her mother (Ochoa) for $7200 in a dispute over a car and, in December 2013, the court ruled in Ochoa's favor. Muniz stated that in early 2014, her relationship with Ochoa was improving, and they went on a vacation together in May 2014.

¶ 20    Muniz testified that, as of summer 2014, J.C.'s paternal grandmother (Cruz) lived next door to the home shared by defendant and Ochoa. At that time, it was "common" for J.C. and her brother to visit defendant and Ochoa's home. When asked if she had ever been to Ochoa and defendant's house in 2014, Muniz testified that she had stopped by "October 20 something" to borrow jewelry. Muniz testified she was "not aware" that J.C. claimed that Muniz was in the home during the alleged Christmas 2014 incident.

¶ 21    Muniz recalled that on Thanksgiving 2015, she brought J.C. and her brother to Ochoa and defendant's house, and that the children stayed at the home until Sunday. She said it was "likely" that J.C. wore a dress on Thanksgiving. Muniz did not remember if she had packed other clothes for the children, noting that they could have gotten clothes from Cruz's home next door.

¶ 22    Ochoa testified that she was J.C.'s maternal grandmother and that she had been married to defendant since 2012. Ochoa stated that her relationship with her daughter, Muniz, was "very complex." She acknowledged that Muniz sued her in fall 2013, and that their relationship was "bad" in early 2014. However, Ochoa invited Muniz to go on a May 2014 family trip to Cancun. A day or two before the trip, Muniz came to Ochoa's house with J.C. and dropped off money for the trip. Ochoa testified that this was the only time in 2014 that Muniz or J.C. visited the home she shared with defendant.

¶ 23    Ochoa acknowledged that J.C. and other family members came to her home to celebrate Thanksgiving in 2015. She stated that J.C. wore a dress on Thanksgiving. J.C. and her brother stayed overnight because their mother "just left them there."  J.C. and her brother did not have any extra clothes packed. The next morning, Ochoa left for work before 6 a.m. and she returned to the home around 3 p.m. When she returned, she saw defendant "on top of the bed talking on the phone" while J.C. was "under the bed" playing with one of the family's dogs. J.C. was wearing the same dress she had worn the day before. Ochoa did not see J.C. on the bed at any point. Ochoa denied that J.C. and her brother stayed at the home on the night after Thanksgiving.

¶ 24    P.M., who was 14 years old at the time of trial, testified that Ochoa is his mother and that Muniz (J.C.'s mother) is his older sister. He testified that, at one time, defendant lived in the same home with Ochoa and him.

¶ 25    P.M. recalled that several family members gathered at his home for Thanksgiving 2015. J.C. and her brother, Jose, stayed at the home overnight. P.M. recalled that J.C. and her brother did not have pajamas packed, and so J.C. slept in the dress she wore to Thanksgiving. The next day (Friday), he was in the home with Jose, J.C. and defendant. P.M. and Jose played video games in

the living room. P.M. recalled that J.C. was wearing the same dress that day, and that she played with the dog and watched TV. He recalled that J.C. was feeding the dog chocolates "in my mom's room" and he told her to stop. J.C. went in and out of the bedroom "a lot" during the course of the day. P.M. recalled that defendant was in the bedroom on the same day. On cross-examination, P.M. admitted that there were times on Thanksgiving and the following day when he did not see J.C. or defendant.

¶ 26     Defendant testified that he was 37 years old at the time of trial and married to Ochoa, J.C.'s grandmother. He denied any knowledge of J.C. ever visiting his home in 2014, other than a single time when Muniz came to drop off money. He recalled that several family members, including Muniz, Jose, and J.C., came to the home on Thanksgiving 2015. He stated that J.C. and Jose slept over but it was not a planned overnight visit, so they did not bring pajamas. The next day, defendant woke up around 10 a.m. and spent most of the day watching TV in his bedroom.  Over the course of the day, J.C. came into his room "four or five times" to find the dog, who would go under the bed. J.C. went under the bed and gave the dog chocolates, and he told her not to do that. Jose and P.M. were also in the house playing video games. Defendant said that he was on the phone with his mother when Ochoa came home from work that afternoon.

¶ 27     Defendant stated that J.C. wore the same dress on Thanksgiving and the following day. He denied that he ever pulled J.C. into the bedroom, touched J.C. inappropriately, or exposed himself to her.

¶ 28     The State called Yadira Mazon as a rebuttal witness. Mazon testified that she worked for DCFS and that she investigated J.C.'s allegations. On February 29, 2016, she interviewed Ochoa,

J.C.'s maternal grandmother. Mazon recalled that Ochoa was crying and upset, and that Ochoa told her that she had lost trust in her husband.

¶ 29 Following argument, the court found defendant guilty of the charges relating to the alleged incidents around Christmas 2014 (count 2 and counts 10 through 15) and Thanksgiving 2015 (count 1 and counts 4 through 9). The court found insufficient evidence to prove the counts related to the alleged summer 2014 incident (count 3 and counts 16 through 21.)

¶ 30 In announcing its ruling, the court noted that J.C. was "very articulate" and an "excellent witness." The court remarked that J.C. was "direct" and "very sharp for a young lady her age, and she didn't hesitate with her answers whatsoever." The court also noted she was "excellent on the video" of her interview with Llamas. With respect to defendant, the court noted: "I find it curious that the Defendant said he was there. He was in the bedroom while [J.C.] may have been under the bed. He remained there for a while." The court also remarked "The one thing I kept going back to was why the Defendant remained in the bedroom the entire day."

¶ 31 Defendant filed a motion to reconsider, arguing that the State did not prove his guilt beyond a reasonable doubt with respect to either the alleged Christmas 2014 or Thanksgiving 2015 incidents. In that motion, defendant argued that: (1) J.C.'s statements to Cruz describing the abuse were "drastically different" from her recorded statements to Llamas and her trial testimony; (2) the fact that defendant spent most of the day after Thanksgiving in his bedroom was "not a cause for concern" because the living room was occupied by J.C.'s brother and uncle; (3) J.C. was not at Ochoa and defendant's home on Christmas 2014; and (4) whereas J.C. had stated that defendant pulled off her pants, other witnesses testified that she wore a dress on Thanksgiving 2015 and the next day.

¶ 32    In denying the motion, the court explained:

"[O]ne of the items of proof in this case was the video that was introduced and where it was detail[ed] by [J.C.] with the Child Advocacy Center worker that, in fact, certain things occurred.

She was positive. She was direct. She actually corrected the worker at certain times. She was sure as to what occurred. In judging that, as well as her testimony, it's a question of credibility. * * *

One of the things that was pointed out was that she was possibly wearing a dress on a certain occasion. And I know that the defense called a number of witnesses. One of them being [P.M.], the young boy, who indicated that she may have been wearing a dress. But, in fact, corroborated that she was there throughout the time period * * * over the Thanksgiving holiday of 2015.

One of the other things that I was concerned about was I understand [defense counsel's] argument that this is an apartment. There was extensive cross-examination regarding the rooms in the apartment and the location of where people may have been in the apartment.

It is very difficult for this Court to believe that even though there are a number of rooms in the apartment * * * that the defendant remained in the bedroom, which is the same room where [J.C.] testified she was at when he reached out and grabbed her and touched her inappropriately."

The court emphasized that defendant, in his testimony, "admit[ted] * * * being in the bedroom where [J.C.] says the one act occurred." The court concluded: "In looking at the totality of the

evidence, it is this Court's opinion that the other matters, the matters of November 26th through November 29th, and the matters over Christmas of 2014 * * * were proven beyond a reasonable doubt, and the defendant was guilty of those charges."

¶ 33    After a hearing, the court sentenced defendant on counts 1 and 2, for predatory criminal sexual assault of a child, to consecutive 7-year terms. On count 4, for aggravated criminal sexual abuse, defendant was sentenced to a term of 4 years, to run consecutive to the sentence imposed on counts 1 and 2. Counts 5, 6, 7, 8 and 9 merged into count 4. On count 10, for aggravated criminal sexual abuse, defendant was also sentenced to a term of four years, to run concurrent with the sentence on count 4. Counts 11, 12, 13, 14, and 15 merged into count 10. Defendant appeals.

¶ 34    On appeal, defendant contends that the State failed to prove his guilt beyond a reasonable doubt. "When reviewing a challenge to the sufficiency of the evidence, this court considers whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original; internal quotation marks omitted.) *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007). In a bench trial, "it is for the trial judge, sitting as the trier of fact, to determine the credibility of witnesses, to weigh evidence and draw reasonable inferences therefore, and to resolve any conflicts in the evidence." *People v. Siguenza-Brito*, 235 Ill. 235, 213, 228 (2009). "The reviewing court will not retry the defendant or substitute its judgment for that of the trier of fact on questions involving the weight of the evidence, conflicts in the testimony, or the credibility of witnesses. [Citation.]" *People v. Corral*, 2019 IL App (1st) 171501, ¶ 71. "[T]he fact finder's decision to accept testimony is entitled to great deference but is not conclusive and does not bind the reviewing

court. [Citation.] Only where the evidence is so improbable or unsatisfactory as to create reasonable doubt of the defendant's guilt will a conviction be set aside. [Citation.]" *Id.* ¶ 72.

¶ 35    "The mere existence of conflicting evidence at trial does not require a reviewing court to reverse a conviction." *People v. Peoples*, 2015 IL App (1st) 121717, ¶ 67. Rather, "[i]t is sufficient if all of the evidence taken together satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt." (Internal quotation marks omitted.) *Id.*

¶ 36    In this case, to prove defendant guilty of predatory criminal assault of a child (counts 1 and 2), the State was required to prove that defendant was 17 years of age or older and that he "commit[ted] an act of contact, however slight, between the sex organ or anus of one person and the part of the body of another for the purpose of sexual gratification or arousal" and the victim was under 13 years of age. 720 ILCS 5/11-1.40 (West 2016). "A defendant's intent to arouse or gratify himself sexually can be inferred solely from the nature of the act." *People v. Burton*, 399 Ill. App. 3d 809, 813 (2010).

¶ 37    With respect to the aggravated criminal sexual abuse offenses in counts 4 and 10, it was the State's burden to prove that defendant was 17 years of age or over and "commit[ted] an act of sexual conduct with a victim who is under 13 years of age." 720 ILCS 5/11-1.60 (c)(1)(i) (West 2016). "Sexual conduct" means "any knowing touching or fondling by * * * the accused, either directly or through clothing of the sex organs, anus, or breast of the victim * * * or any part of the body of a child under 13 years of age * * * for the purpose of sexual gratification or arousal of the victim or the accused."  720 ILCS 5/11-0.1 (West 2016).

¶ 38    In this court, defendant does not dispute that he was over 17 years of age and that J.C. was under 13 years of age during the relevant time periods. We further note that defendant's argument

does not make any distinction between the sort of touching necessary to prove predatory criminal sexual assault to support counts 1 and 2, compared to the type of contact needed to prove aggravated criminal sexual abuse (counts 4 and 10).

¶ 39    Rather, he asserts that there was insufficient evidence to prove that he had *any* improper contact with J.C. Specifically, he posits three points in support of his challenge to the sufficiency of the evidence. First, he claims that Cruz's testimony at the section 115-10 hearing was not credible. Second, he asserts that witness testimony establishes that J.C. was never at his home at Christmas in 2014. Third, he contends that J.C.'s testimony regarding the Thanksgiving 2015 incident is inconsistent and lacks credibility. Defendant maintains that these "inconsistences are not minor and raise questions of reasonable doubt."

¶ 40    Viewing the evidence in the light most favorable to the State, we find that a rational trier of fact could conclude that defendant committed the acts of sexual abuse that allegedly occurred around Christmas 2014 and Thanksgiving 2015. We initially note that defendant's argument essentially attacks the credibility of the State's evidence, focusing on conflicting testimony and inconsistencies in J.C.'s trial testimony. To the extent that J.C.'s credibility may have been affected by certain inconsistencies, it was the responsibility of the trier of fact, in this case the trial court, to determine her credibility, the weight to be given to her testimony and to resolve any inconsistencies and conflicts in the evidence. *People v. Starks*, 2014 IL App (1st) 121169, ¶ 51; *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006); see also *People v. Nwosu*, 289 Ill. App. 3d 487, 493-94 (1997) ("The trier of fact is also given the function of resolving discrepancies or conflicts in the testimony. [Citation.] It is not the function of this court to retry the defendant when considering a challenge to the sufficiency of the evidence"). We will not substitute our judgment

for that of the trier of fact on these matters. *Sutherland*, 223 Ill. 2d at 242. As mentioned, this court will reverse a defendant's conviction only when the evidence is so improbable or unsatisfactory that it creates a reasonable doubt as to the defendant's guilt. *Siguenza-Brito*, 235 Ill. 2d at 225. For the following reasons, this is not one of those cases.

¶ 41     In this case, the evidence included J.C.'s statements in the forensic interview with Llamas. J.C. described how defendant sat her on a bed in his and Ochoa's home, removed her clothing, and touched her vagina and nipples. She said that this touching occurred on multiple occasions, including around Christmas 2014 and Thanksgiving 2015. At trial, J.C. similarly testified that, in the bedroom of defendant's home, defendant had touched her "private part" and nipples on these separate occasions. This evidence was sufficient for the trial court to find defendant guilty. See *People v. Vannote*, 2012 IL App (4th) 100798, ¶ 48 (in discussing sufficiency of evidence to prove aggravated criminal sexual abuse, noting that the "testimony of a single witness, if credible, is sufficient to convict. [Citations.]").

¶ 42     In this court, defendant attacks the credibility of J.C. and other witnesses. First, defendant criticizes Cruz's section 115-10 hearing testimony on multiple grounds. He points out that Cruz indicated that defendant committed certain acts not described by J.C. Specifically, Cruz claimed that J.C. indicated that defendant put his penis in J.C.'s mouth, and that he put something inside her vagina. As the trial court acknowledged, J.C. did not describe those specific acts; the court noted that Cruz "seemed to relate a few more things than [J.C.] testified to at trial." Nonetheless, this did not preclude the trial court from relying on *any* portion of Cruz's testimony whatsoever. "The trier of fact is free to accept or reject as much or as little of a witness's testimony as it pleases." *People v. Peoples*, 2015 IL App (1st) 121717, ¶ 67; *People v. Corral*, 2019 IL App (1st)

171501, ¶ 85 ("The trier of fact may accept or reject all or part of a witness's testimony."). The trial court was entitled to credit the portions of Cruz's testimony that were consistent with J.C.'s trial testimony and videotaped interview, while disregarding Cruz's reference to acts that were not described by J.C.

¶ 43    Defendant also attacks Cruz's credibility because she "fail[ed] to corroborate material facts of the case." Specifically, he notes that when Cruz was asked about the time frame of the alleged abuse, she referenced Thanksgiving 2015 but did not specify any date in 2014. The court expressly noted that Cruz "d[id] not relate anything about Christmas 2014." However, in its role as finder of fact, the court was free to credit the portion of Cruz's testimony that corroborated the alleged Thanksgiving 2015 abuse.

¶ 44    Defendant's attack on Cruz's testimony is unavailing for a more fundamental reason: the court did not need to rely on her testimony in order to find defendant guilty, given the other testimonial evidence. As with other offenses, in a sex offense case the "testimony of a single witness, if credible, is sufficient to convict. [Citations.]" *Vannote*, 2012 IL App 100798, ¶ 48. Here, the evidence included J.C.'s videotaped statement as well as her trial testimony. The trial court explicitly found J.C. to be articulate, specific, and highly credible, both in her videotaped interview as well as her trial testimony. Thus, even assuming the trial court found that Cruz's testimony lacked credibility, this would not preclude it from relying on J.C.'s testimony to find defendant guilty.

¶ 45    Defendant's second line of attack suggests that there was insufficient evidence for the court to find that the Christmas 2014 abuse described by J.C. could have occurred, in light of other witnesses' testimony. Defendant argues that Muniz's testimony "clearly establishes" that J.C. was

not at defendant's house around that time. He emphasizes that when Muniz was asked if she went to the house at any time in 2014, she said she had visited in October but did not indicate any other visits that year. Defendant also notes that when Muniz was asked "Are you aware that [J.C.] says that you and [Ochoa] were actually in the apartment during this Christmas incident?" she answered that she "was not aware of that." Based on Muniz's testimony, defendant asserts that "it was impossible for the abuse to have occurred in Christmas of 2014." Defendant suggests the court should have credited Muniz's testimony, particularly because "[t]hat year [2014] was memorable to Maribel Muniz because she and her mother were working on repairing a fractured relationship." Defendant also points out that Ochoa testified that she and defendant went to a different house during Christmas 2014.

¶ 46    Defendant essentially argues that, given this contradictory testimony, the court was not entitled to believe J.C.'s account of abuse at Christmas 2014. That is, he invites us to reweigh the testimony of the witnesses. However, as mentioned, it is not the role of a reviewing court to substitute our judgment for that of the trier of fact with respect to the weight of the evidence, conflicts in the testimony or witness credibility. *Corral*, 2019 IL App (1st) 171501, ¶ 71. The trial court, sitting as trier of fact with the opportunity to observe the witnesses first-hand, was entitled to believe J.C.'s testimony that she was abused at defendant's house around Christmas 2014. To the extent other witnesses contradicted that time frame, the court apparently found that they were mistaken or not convincing. Viewing the evidence in the light most favorable to the prosecution, we cannot say that these credibility determinations were unreasonable. See *id.* ¶ 72 ("Testimony may be found insufficient * * * only where the evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt."). We thus reject defendant's argument that

conflicting testimony made it "impossible" for the court to find that defendant abused J.C. around Christmas 2014.

¶ 47　Defendant's third line of argument attacks the sufficiency of the evidence of the alleged Thanksgiving 2015 abuse, contending that J.C.'s testimony about that incident was so inconsistent that it could not be deemed credible. Defendant identifies a number of purported inconsistencies in J.C.'s recollection of the events leading up to the Thanksgiving 2015 incident. He points out that, when J.C. was asked about the incident at trial, she first stated that she was eating a strawberry when she was "pulled into the bedroom"; however, she then testified that she followed a dog under the bed before defendant approached her. Defendant also points out that, during her videotaped forensic interview with Llamas, J.C. stated that she had been watching television in the bedroom when defendant entered and abused her. Defendant argues that these inconsistencies undermine J.C.'s testimony, to the point that the court could not have found that the abuse occurred.

¶ 48　We disagree. "A complainant's testimony need not be unimpeached, uncontradicted, crystal clear or perfect in order to sustain a conviction for sexual abuse. [Citations.] Where minor inconsistencies or discrepancies exist in a complainant's testimony but do not detract from the reasonableness of her story as a whole, the complainant's testimony may be found to be adequate to support a conviction for sexual abuse." *People v. Garcia*, 2012 IL App (1st) 103590, ¶ 84 (quoting *People v. Soler*, 228 Ill. App. 3d 183, 200 (1992)). "Additionally, discrepancies in testimony * * * do not necessarily destroy the credibility of a witness, but go only to the weight to be afforded [her] testimony." (Internal quotation marks omitted.) *Garcia*, 2012 IL App (1st) 103590, ¶ 85.

¶ 49    We acknowledge inconsistencies in J.C.'s description of the events leading up to the abuse on the day after Thanksgiving 2015. Specifically, she gave conflicting accounts of how she came to be in the bedroom. However, such inconsistencies do not preclude a trial court from crediting a victim's testimony that the abuse did, in fact, occur. See *People v. Bowen*, 183 Ill. 2d 103, 122 (1998) (rejecting argument that evidence was insufficient to prove oral penetration to support aggravated criminal sexual assault, notwithstanding "missing details and inconsistencies in D.M.P.'s statement" where inconsistencies were "relatively minor and bore only upon the weight to be afforded the child's testimony"); *Garcia*, 2012 IL App (1st) 103590, ¶ 84 (although victim's testimony contained discrepancies as to "such minor matters as whether the incidents occurred on a bed or on a blanket or whether they occurred in the victim's room," "we cannot find that any inconsistencies in the victim's account are so serious as to prevent a rational trier of fact from finding defendant guilty beyond a reasonable doubt."). Notably, despite her inconsistent statements as to how she arrived in the bedroom, J.C.'s testimony and videotaped statements consistently described the manner in which defendant placed her on the bed and touched her inappropriately. See *id.* (finding that inconsistencies in victim's testimony and outcry statements were not "so egregious as to detract from the reasonableness of her story as a whole" where "[t]he victim consistently stated that defendant 'put his eggs in her parts,' meaning her vagina and buttocks, and that he did so at their previous apartment while [victim's mother] was at work.").

¶ 50    The trial court apparently found that, despite any inconsistencies, J.C. was credible when she described how defendant improperly touched her on the day after Thanksgiving in 2015. The trial court, which observed J.C.'s demeanor first-hand, was entitled to do so. As noted above, in announcing its ruling, the trial court determined that J.C. was an "excellent" witness in this case,

noting that she gave "direct" and specific testimony. We will not second-guess those findings. See *People v. Fields*, 2017 IL App (1st) 110311-B, ¶ 30 (it was the trial court's responsibility, as the trier of fact, to make credibility determinations); *People v. Rudell*, 2017 IL App (1st) 152772, ¶ 24 (a reviewing court will not substitute its judgment for that of the trier of fact on questions of the credibility of witnesses). We cannot find that the inconsistencies in J.C.'s testimony "are so egregious as to detract from the reasonableness of her story as a whole" or "so serious as to prevent a rational trier of fact from finding defendant guilty beyond a reasonable doubt." *Garcia*, 2012 IL App (1st) 103590, ¶ 84.

¶ 51    In sum, all of the defendant's arguments amount to attacks on the trial court's credibility findings, in its capacity as the finder of fact. However, it is not our role to "substitute [our] judgment for that of the trier of fact on questions involving the weight of the evidence, conflicts in the testimony, or the credibility of witnesses." *Corral*, 2019 IL App (1st) 171501, ¶ 71. Rather, our inquiry is whether, viewing the evidence in light most favorable to the prosecution, any rational trier of fact could find defendant guilty beyond a reasonable doubt. *Id.* The trial court was entitled to credit J.C.'s detailed account (in both her videotaped interview and trial testimony) of how defendant abused her around Christmas 2014 and the day after Thanksgiving 2015. That evidence was sufficient for the court to find defendant guilty beyond a reasonable doubt on the corresponding counts of predatory criminal sexual assault of a child and aggravated criminal sexual abuse.

¶ 52    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 53    Affirmed.